**Margaret SABO, Administratrix of the Estate of John Strelecki, Jr., Deceased**

v.

**Helen B. O'BANNON, A. Russell Parkhouse, Paul Bartle, Rita Banning, Dr. Herman Roether, Dr. Russell G. Rice Jr., Henry Starr, and Montgomery County.**

Civ. A. No. 81–3690.

United States District Court,
E.D. Pennsylvania.

March 29, 1984.

Charles J. King, Jr., Norristown, Pa., for plaintiff.

Mollie A. McCurdy, Deputy Atty. Gen., Harrisburg, Pa., for Com. defendants O'Bannon, Rice and Starr.

Catherine M. Harper, Philadelphia, Pa., for county defendants Montgomery County, Roether, Parkhouse, Bartle and Banning.

## OPINION

DITTER, District Judge.

John C. Strelecki, Jr., was a mildly retarded individual who was involuntarily committed to Embreeville State Hospital on March 17, 1980, pursuant to an order of the Montgomery County Court of Common Pleas. On April 3, 1980, Strelecki choked on his food while eating lunch and died shortly thereafter due to asphyxiation. Margaret Sabo, Strelecki's mother and the administratrix of his estate, brought this action against various state and local officials [1] pursuant to 42 U.S.C. § 1983, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the fourth, sixth, eighth, and fourteenth amendments of the United States Constitution. Plaintiff alleges that the defendants denied Strelecki his right to minimally adequate treatment, his right to safe conditions, and his right to be free from chemical restraint. *See* Amended Complaint ¶ 26, 27. Presently before me are the motions of the defendants for summary judgment. For the reasons that follow, defendants' motions for summary judgment will be granted in part and denied in part.

## I. Facts

The following facts are undisputed. John Strelecki was a mildly retarded individual who was 34 years old at the time of his death. He was diagnosed as having moderate mental deficiencies coupled with an explosive personality and a history of violent outbursts. Strelecki had been institutionalized in state schools and mental health hospitals for the majority of his life. On February 13, 1980, while living with the plaintiff in Montgomery County, Pennsylvania, Strelecki made threatening gestures towards her and thereafter, upon plaintiff's petition, was committed to the Montgomery County Mental Health/Mental Retardation Emergency Service facility for treatment for a period not to exceed five days pursuant to section 302 of the Mental Health Procedure Act (the Act), 50 Pa.Cons.Stat. Ann. § 7302 (Purdon 1983). One week later, Strelecki was admitted to Norristown State Hospital for additional treatment for a period of 20 days pursuant to section 303 of the Act, 50 Pa.Cons.Stat.Ann. § 7303 (Purdon 1983). This treatment period was later extended indefinitely when Strelecki agreed to enter a voluntary inpatient treatment program under 50 Pa.Cons.Stat.Ann. § 7201 (Purdons 1983). Under the terms of this program he would be able to leave Norristown State Hospital within 72 hours after submitting a written request. Finally, after a commitment hearing was held pursuant to section 406 of the Mental Health and Retardation Act, 50 Pa.Cons. Stat.Ann. § 4406 (Purdon 1983), the Montgomery County Court of Common Pleas ordered Strelecki committed to Embreeville State Hospital for a period not to exceed 60 days. Soon after his transfer to Embreeville, he choked on his food while eating lunch and died. Plaintiff asserts that her son's death resulted from the excessive amounts of drugs that were administered to him during his confinement at Embreeville, which caused a depression of his central nervous system and suppression of his gag reflex.

During Strelecki's confinement at Norristown State Hospital, plaintiff contacted the

1. The following persons are named as defendants: Helen O'Bannon, the Secretary of Welfare for the Commonwealth of Pennsylvania; Russell Rice, the regional Commissioner for Mental Retardation for Southeastern Pennsylvania; Harry Starr, the facility director of Embreeville State Hospital; Herman Roether, administrator of Montgomery County Office of Mental Health/Mental Retardation; the commissioners of Montgomery County, A. Russell Parkhouse, Paul Bartle and Rita Banning; and Montgomery County itself. Since this action was instituted, several of these defendants no longer serve in these positions.

staff of the Pennsylvania Department of Public Welfare and the Montgomery County Mental Health/Mental Retardation offices in an effort to obtain an alternative placement for him. One location that plaintiff desired for her son was Hilltop Haven, a state intermediate care facility for the mentally retarded located in Allentown, Pennsylvania. Hilltop Haven serves the northeast region of the state, including Lehigh, Northampton, Carbon, Monroe, Pike, and Bucks counties. Its patients are limited to those coming from the mental health unit of Allentown State Hospital. Because he was neither a patient at Allentown State Hospital nor a resident of a county in the region served by Hilltop Haven, Strelecki was refused placement there.

Plaintiff also sought to have her son placed in a Community Living Arrangement (CLA) program maintained by Montgomery County. Among the 38 CLAs that were operated by the county were five Adult Behavior Shaping programs. It was the opinion of the staff of the Montgomery County Mental Retardation Program that the most appropriate placement for Strelecki would have been in an Adult Behavior Shaping Program because of his violent conduct. None of the CLAs that existed between December, 1979, and March, 1980, was considered to be suitable a placement for him. Accordingly, he was scheduled to remain at Embreeville until the late spring of 1980, when it was anticipated that an appropriate arrangement would become available.

In their motions for summary judgments, defendants contend that they are entitled to qualified immunity since their conduct did not violate any clearly established constitutional rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In addition, defendants assert that they lack the personal involvement that is necessary before liability may be imposed under section 1983. *See Mo-*

*nell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Before I turn to these arguments, however, it is first necessary to determine whether plaintiff has asserted cognizable claims under the particular laws she relies upon and whether any of the defendants are absolutely immune from liability.

## II. Section 504 of the Rehabilitation Act of 1973

Plaintiff's first theory of liability is founded upon section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,[2] which she contends reflects a legislative mandate to ensure mentally handicapped individuals the right to minimally adequate habilitation. The defendants allegedly violated this statute by failing to develop a treatment plan for Strelecki in lieu of institutionalization and by placing him in Embreeville State Hospital, rather than in either Hilltop Haven or in a Montgomery County CLA. As a result of their conduct plaintiff seeks $1 million in damages. Because section 504 does not create an obligation upon the defendants to undertake the action that was sought and, in any event, because this statute does not allow for an award of damages absent an allegation of intentional discrimination, this claim must be dismissed.

In determining the obligations imposed upon the defendants under section 504, the starting point is the language of the statute itself. *See supra* note 2. The section appears to be plain. Under this statute, a person who is qualified to perform a task or to enter an educational institution or to receive the benefits of any program or activity that receives federal assistance may not be denied these opportunities simply because he or she is handicapped. *Kentucky Association for Re-*

---

**2.** This statute states in pertinent part:

No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or

be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

tarded Citizens v. Conn, 510 F.Supp. 1233, 1243 (W.D.Ky.1980), aff'd 674 F.2d 582 (6th Cir.1982). This statute represents a prohibition of certain conduct on the part of the recipients of federal financial assistance. It is silent with regard to the imposition of any duty or affirmative conduct on the part of a state or municipality. See Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir. 1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983).

The view that section 504 does not obligate a recipient of federal funding to undertake any positive action is supported by the decision of the Supreme Court in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), in which a hearing impaired student sought admission to a nursing school. Noting that her placement would require a fundamental alteration of the school's facilities, the Court stated that, "[N]either the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds." Id. at 411, 99 S.Ct. at 2369.

Chief Judge Seitz, in his persuasive dissent in the much-traveled case of Halderman v. Pennhurst State School & Hospital, 612 F.2d 84 (3d Cir.1979) (en banc), rev'd 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), opinion on remand, 673 F.2d 647 (3d Cir.1982) (en banc), rev'd —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), echoed a similar rationale.[3] At issue was whether section 504 mandates positive action by the state to create new, less restrictive habilitation facilities. Chief Judge Seitz stated that the structure and intent behind this statute was to provide a financial incentive on the part of states towards ensuring the handicapped equal access to federally funded programs, rather than any sort of legislative mandate for action. "The carefully tailored system of programs and grants in the legislation as a whole belies any congressional intention to impose an absolute duty to provide the least restrictive treatment." 612 F.2d at 120. See also Kentucky Association for Retarded Citizens v. Conn, 510 F.Supp. 1233, 1243 (W.D.Ky.1980), aff'd 674 F.2d 582 (6th Cir.1982) (Section 504 does not include a legislative mandate for deinstitutionalization).

■■■ Several courts that have considered the applicability of section 504 in circumstances similar to the present case have agreed no cause of action exists where the gravamen of the plaintiff's complaint is that section 504 was violated by denying a mentally retarded individual placement in a residential, non-institutional facility. See Manecke v. School Board of Pinellas County, 553 F.Supp. 787, 790 n. 4 (M.D.Fla.1982); Garrity v. Gallen, 522 F.Supp. 171, 213 (D.N.H.1981). The case law and the statutory language is clear that while section 504 prohibits a handicapped individual's being excluded from, being denied the benefits of, or being discriminated against by a recipient of federal financial assistance, it does not mandate any type of affirmative action by the recipient. I therefore hold that to the extent plaintiff seeks to assert a claim under section 504, the complaint must be dismissed.

■■■ Moreover, even if a cause of action did exist under section 504, the claim must still be dismissed due to the unavailability of damages under this statute in the absence of an allegation of intentional discrimination. The issue of whether a private action for damages exist under section 504 has been the subject of conflict among circuit and district courts. Compare Miener v. Missouri, 673 F.2d 969 (8th Cir.), cert. denied, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); David H. v. Spring Branch Independent School District, 569 F.Supp. 1324 (S.D.Tex.1983); Christopher N. v. McDaniel, 569 F.Supp. 291 (N.D.Ga. 1983) (Damages available) with Colin K. v.

---

3. Although Pennhurst has been to the Supreme Court twice, the specific issue of whether section 504 imposes an affirmative obligation upon a recipient of federal funding to provide the least restrictive treatment to mentally retarded individuals has not been resolved by either the Supreme Court or the Third Circuit.

*Schmidt,* 715 F.2d 1 (1st Cir.1983); *Marvin H. v. Austin Independent School District,* 714 F.2d 1348 (5th Cir.1983); *Reinman v. Valley View School,* 527 F.Supp. 661 (N.D. Ill.1981). (Damages unavailable). This issue, however, appears to have been resolved by the recent decision by the Supreme Court in *Guardians Association v. Civil Service Commission,* — U.S. —, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Under the statutory scheme of section 504, the remedies for a violation of this section include those set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.* *See* 29 U.S.C. 794a(a)(2). In *Guardians Association,* a majority of the Court, while failing to agree unanimously on most issues, did reach a consensus that compensatory damages are unavailable under Title VI absent a showing of intentional discrimination by the defendants. 103 S.Ct. 3235 n. 27.[4] This applies with equal effect to a claim under section 504. *See* 29 U.S.C. § 794a(a)(2). Because plaintiff has failed to allege that the defendants acted with discriminatory intent, damages are unavailable for the claim plaintiff has asserted.

### III. Constitutional Claims

In addition to her claim under section 504, plaintiff has averred that the defendants violated Strelecki's rights guaranteed to him under the fourth, sixth, eighth, and fourteenth amendments. She seeks damages under 42 U.S.C. § 1983 as a result of these alleged violations. The defendants contend that they are entitled to summary judgment because to the extent the rights asserted by plaintiff exist, they were not clearly established at the time the actions took place, and therefore defendants are entitled to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Even if the rights were clearly established, defendants maintain that they lack the personal involvement in the alleged violation necessary for liability under section 1983.

The first three of plaintiff's claims may be disposed of quickly. The Supreme Court has recognized that the prohibition of the fourth amendment against unreasonable searches and seizures includes an individual's right to be free from unjustified intrusions by the state. *See Ingraham v. Wright,* 430 U.S. 651, 673 n. 42, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The right to personal security embodied in this amendment, however, arises primarily in the course of criminal investigations. *Id.* Because plaintiff does not contend that commitment proceedings are in any way analogous to criminal investigations, the fourth amendment claim must be dismissed. Similarly, because plaintiff's complaint is void of any assertion that Strelecki was denied counsel at any stage of the commitment proceedings where a right to representation existed, the sixth amendment claim must also be dismissed. *See Johnson v. Solomon,* 484 F.Supp. 278 (D.Md.1979).

With regard to the eighth amendment claim, this, too, must fail. The eighth amendment protects against cruel and unusual punishment only after conviction of a crime. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Because Strelecki was a patient in a mental institution rather than a convicted inmate, the eighth amendment claim must be dismissed. *See Romeo v. Youngberg,* 644 F.2d 147, 156 (3d Cir.1980), *rev'd on other grounds,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Gann v. Delaware State Hospital,* 543 F.Supp. 268, 272 (D.Del.1982).

Plaintiff's final claim is based upon liberty interests protected by the Due Process Clause of the fourteenth amendment. Plaintiff's claim has three discrete bases: first, that Strelecki's right to minimally adequate treatment was violated; second, that his right to be free from harm during

---

4. *See also Consolidated Rail Corp. v. Darrone,* 52 U.S.L.W. 4301, 4303 (U.S.1984): [W]e think it clear that § 504 authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for backpay."

the course of his treatment was violated;[5] and third, that his right to be free from chemical restraint was violated.

■ There can be no doubt at this juncture that the rights asserted by plaintiff have been recognized to exist under certain circumstances. The leading case that defines the substantive rights of involuntarily-committed mentally retarded persons under the fourteenth amendment is *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg,* the plaintiff was a profoundly retarded individual who had been involuntarily committed by the Philadelphia County Court of Common Pleas to the Pennhurst State School and Hospital. While at Pennhurst, plaintiff was injured on numerous occasions as a result of attacks upon him by other patients and possibly by the staff, and also due to his own violence. During the course of his treatment for one of his injuries, plaintiff's arms were tied to his bed and chair. In an action brought under 42 U.S.C. § 1983, plaintiff contended that this violated his constitutional rights as did the defendants' failure to provide him with appropriate treatment for his mental retardation. The Third Circuit found plaintiff's fourteenth amendment liberty interests, including his right to personal security and protection, his right to be free from undue bodily restraint, and his right to adequate treatment, had been violated. *See Romeo v. Youngberg,* 644 F.2d 147 (3d Cir.1980) (en banc). The Supreme Court agreed with the court of appeals that these rights existed, but vacated and remanded the case because the Third Circuit has applied an erroneous standard. The Court declined to adopt the "least intrusive means" analysis announced by the Third Circuit and instead held the standard for determining damage recovery for mentally retarded patients against doctors and other professionals depends on whether "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462 (footnote omitted). This deferential standard recognizes the course of treatment chosen by the professional decision-maker is presumptively correct. *Id.* at 323, 102 S.Ct. at 2462. To determine whether a plaintiff's constitutional rights have been violated, it is necessary to balance the individual's liberty interests against the relevant state interests. *Id.* at 321, 102 S.Ct. at 2461. Limitations upon an individual's interests are constitutionally permissible to the extent such limitations do not constitute substantial departures from professional judgment. *Johnson by Johnson v. Brelje,* 701 F.2d 1201, 1208–09 (7th Cir.1983).

As noted above, both the Third Circuit and the Supreme Court were in agreement that an involuntarily-committed, mentally retarded person has certain liberty interests. For the present purpose, the issue is whether the facts outlined by plaintiff state a violation of these rights. With regard to Strelecki's right to be free from harm, plaintiff has alleged that this right was violated by the defendants' use of drugs in his treatment. Plaintiff's Brief Opposing Motion for Summary Judgment by State Defendants at 9. As a result of this treatment, the defendants created an unsafe condition that resulted in Strelecki's death.

■ In *Youngberg,* the question was whether the defendants were liable for allowing plaintiff to be injured repeatedly as a result of attacks by other patients and also by his own actions. The court of appeals found that plaintiff's right to personal security had been violated by a pattern of attacks, injuries, and violent behav-

---

**5.** Plaintiff's claim of the right to be free from harm is correlative of the right to safe conditions which was analyzed by the Supreme Court in *Youngberg v. Romeo,* 457 U.S. 307, 317–18, 102 S.Ct. 2452, 2459, 60 (1982). Although the Supreme Court labeled this interest the right to safe conditions, *id.,* and the Third Circuit labeled it the right to protection from attack, 644 F.2d at 162, both courts agreed that the genesis of this liberty interest is the right to personal security.

ior that continued even though the defendants knew, or had reason to know, of some or all of the injuries suffered by the plaintiff. 644 F.2d at 162–63. In affirming this portion of the decision, the Supreme Court said the right of personal safety included a right to safe conditions that was protected substantively by the Due Process Clause. 457 at 317–18, 102 S.Ct. at 2459–60. While the factual circumstances are admittedly different in the present case, the same interests are implicated. If the right to safe conditions includes the right to be free from a pattern of attacks and injuries, then it must also protect against the alleged unsafe administration of drugs. Allegedly, but for this pattern of treatment, Strelecki would not have died. Accordingly, plaintiff's assertion of a violation of Strelecki's right to be free from harm, being a part of the right to safe conditions, presents a cognizable claim.

The second basis of plaintiff's claim involves a right that was also not precisely at issue in *Youngberg*. There, the Supreme Court held that the use of "soft" restraints upon Romeo's arms during his commitment violated his due process right to be free from bodily restraint. 457 U.S. at 316, 102 S.Ct. at 2458. The issue here is whether this liberty interest includes the right to be free from chemical restraint.[6]

■■■■ "Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18, 99 S.Ct. 2100, 2109, 60 L.Ed.2d 668 (1979) (Powell, J., concurring). *See Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977). Due to the fundamental nature of this right, it is necessary to view its contours broadly. Because the use

of "soft" restraints was found to implicate a liberty interest in *Youngberg*, it can scarcely be doubted that the use of drugs in order to restrain a patient must activate a similar interest. In contrast to the use of physical restraints, which may represent more in the way of humiliation and degradation than an actual threat to physical safety, the long-term use of chemical restraints can have a far more pernicious effect upon the patient.

Unlike the temporary and predictable effects of bodily restraints, the permanent side effects of antipsychotic drugs induce conditions that cannot be corrected simply by cessation of the regimen. The permanency of these effects is analogous to that resulting from such radical surgical procedures as a pre-frontal lobotomy. The consequences of error are far more serious in the drug cases than those of Romeo's physical restraints, and therefore, a standard commensurate with the potential harm to the patient is required.

*Rennie v. Klein*, 720 F.2d at 276 (Weis, J., concurring). Therefore, consistent with the principle delineated in *Youngberg*, I hold that plaintiff has asserted a cognizable claim under the fourteenth amendment for a violation of Strelecki's liberty interest to be free from chemical restraint.

■■■■ The final element of plaintiff's fourteenth amendment claim is that Strelecki's right to minimally adequate treatment was violated by the defendants' alleged failure to provide minimally adequate or reasonable training to ensure safety and freedom from restraint. *See* Plaintiff's Brief Opposing Motion for Summary Judgment by State Defendants at 8. Again, this right was recognized by the Supreme Court in *Youngberg*. *See* 457 U.S. at 319, 102 S.Ct. at 2460. Because of the needs

---

**6.** Chemical restraint is described as "the use of drugs for the specific and exclusive purpose of controlling acute or episodic behavior." 55 Pa. Code § 6400.5. Plaintiff asserts that Strelecki's right to be free from chemical restraint was violated by the administration of excessive amounts of drugs in connection with his treatment. Because plaintiff has not alleged that the

use of drugs was forced upon Strelecki, this action presents a different situation than the one in *Rennie v. Klein*, 720 F.2d 266 (3d Cir. 1983) (en banc), in which the Third Circuit reaffirmed its recognition of the right of an involuntarily-committed mentally ill patient to refuse the administration of antipsychotic drugs.

and relief sought by that particular plaintiff, the Supreme Court limited this interest to the right to training to ensure safety and freedom from undue restraint. The Court noted, however, that the scope of this right was not subject to categorical rules but instead depended upon the facts and circumstances of each particular case. *Id.* at 319 n. 25. This right to training exists to the extent that the training will further the plaintiff's liberty interest. It is therefore necessary to examine the particular type of training in question to determine whether it advances the individual's basic interest in liberty. *Association for Retarded Citizens of North Dakota v. Olson*, 561 F.Supp. 473, 487 (D.N.D.1982), *aff'd on the merits*, 713 F.2d 1384 (8th Cir.1983). It is not necessary at this time to define the scope of Strelecki's rights in light of plaintiff's averment that the defendants' policies and actions failed to provide him any treatment, but instead were merely intended to manage him by chemical restraints. *See* Amended Complaint ¶ 23. For the present purposes, it is sufficient to say that plaintiff has stated a cause of action for a violation of Strelecki's right to minimally adequate training.[7]

In sum, I conclude plaintiff's claims under section 504 of the Rehabilitation Act of 1973, and the fourth, sixth and eighth amendments must be dismissed, while the claims asserted under the fourteenth amendment claims should proceed.

## IV. Immunity and Other Defenses

 Having concluded that cognizable causes of actions have been alleged as to certain of plaintiff's claims, I must now decide whether any of the defendants are entitled to either absolute or qualified immunity. With regard to the Montgomery County Commissioners, A. Russell Parkhouse, Paul Bartle, and Rita Banning, all claims against them must be dismissed. As elected local government officials, they are entitled to absolute immunity when the acts complained of fall within the scope of their legislative duties. *Aitchison v. Raffiani*, 708 F.2d 96 (3d Cir.1983); *Kuzinich v. County of Santa Clara*, 689 F.2d 1345 (9th Cir.1982). Plaintiff has not asserted that in failing to provide CLAs to serve adequately the needs of the mentally retarded citizens of Montgomery County, the commissioners acted in a non-legislative role.[8] Accordingly, the claims asserted against them must be dismissed.

 With respect to the remaining defendants, I have concluded that the defense of qualified immunity is unavailable. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The court may decide as a matter of law whether the rights alleged to have been violated were "clearly established at the time the action occurred." *Id.* If the law was not clearly established, the defendant should prevail on the basis of the qualified immunity defense unless the plaintiff claims that the official actually knew that he was violating the law. *See Czurlanis v. Albanese*, 721 F.2d 98, 108 (3d Cir.1983). The individual defendants contend that they are entitled to this qualified immunity because the rights alleged to have been violated were not clearly estab-

---

7. It is important to recognize that plaintiff's claim to minimally adequate treatment encompasses only Strelecki's right to a certain level of training that should have been given during his commitment. It does not include the right to care in any particular facility. The right to treatment in *Youngberg* involved only the type of treatment to be given, rather than the location of such treatment. *See Phillips v. Thompson*, 715 F.2d 365, 367 (7th Cir.1983).

8. In fact, it is far from clear exactly what theory of liability plaintiff is asserting against these defendants. I will assume, however, that plaintiff complains of inadequate funding of CLA's by the commissioners. The question of how elected county officials allocate the county's financial resources is a legislative function. *See Oaks v. City of Fairhope*, 515 F.Supp. 1004, 1049 (S.D.Ala.1981).

lished at the time the acts complained of occurred.

This argument fails to acknowledge that the rights asserted by plaintiff are not of recent recognition. In *Youngberg,* the Court stated with reference to the right to freedom from bodily restraint that "the existence of such an interest is clear in the prior decisions of this Court." 457 U.S. at 316, 102 S.Ct. at 2458. I do not view the application of the freedom from bodily restraints to the context of chemical restraints to be especially novel. To the contrary, some rights are so fundamental that even if the precise dimensions of the constitutional bases for recovery are not fully defined at the time of the alleged actions, the officials cannot claim to have acted in good faith when this right is applied in a slightly different context. Due to the fundamental nature of the right to freedom from restraint, *see Greenholtz v. Nebraska Penal Inmates,* 442 U.S. at 18, 99 S.Ct. at 2109 (Powell, J., concurring), and its prior recognition by the Supreme Court, the qualified immunity defense is unavailable as to this claim.

Similarly, this defense does not bar plaintiff's right to minimally adequate treatment claim. As Chief Judge Seitz noted in his concurring opinion in the original *Youngberg* decision, "The existence of a constitutional right to care and treatment is no longer a novel legal proposition." 644 F.2d at 176. While the Supreme Court more precisely outlined what constituted minimally adequate treatment, *see* 457 U.S. at 317–19, 102 S.Ct. at 2459–60, it did not propose for the first time that a right to such care existed. Moreover, notwithstanding the constitutional basis of this right, the interest asserted also had a statutory base of long standing. Strelecki was confined to Embreeville State Hospital pursuant to section 406 of the Pennsylvania Mental Health & Mental Retardation Act of 1966, 50 Pa.Cons.Stat.Ann. § 4406 (Purdon 1983), which provides that an individual is

entitled to "care and treatment" after commitment.[9] "By basing (the plaintiff's) deprivation of liberty at least partially upon a promise of treatment, the state ineluctably has committed the community's resources to providing minimal treatment." *Romeo v. Youngberg,* 644 F.2d at 168. Given this specific statutory entitlement, the defendants cannot claim that this right to entitlement, the defendants cannot claim that this right to minimally adequate treatment was not clearly established. *See Scott v. Plante,* 691 F.2d 634, 639 (3d Cir.1982).

For substantially the same reasons, qualified immunity is not available for plaintiff's claim of Strelecki's right to be free from harm. As previously noted, this right is included within the right to safe conditions, which has its roots in the right to personal security. The Supreme Court found that this was a liberty interest that had been "recognized by prior decision of this Court." 457 U.S. at 315, 102 S.Ct. at 2458. The well-settled nature of this interest was stated even more emphatically by the Third Circuit. "From Colonial times to the present day, the concept of liberty has embraced the 'right to be free from and to obtain judicial relief for unjustified intrusions on personal security.' ... [T]he right to protection from attack undeniably falls within the compass of this right." 644 F.2d at 162 (citation omitted). Accordingly, qualified immunity at this juncture is unwarranted for this claim.

 In the alternative, defendants argue that even if the claims alleged by plaintiff were clearly established, they are nevertheless entitled to judgment because plaintiff has failed to establish that the defendants were personally involved with the constitutional violations or that the violations resulted from any policy or custom of the defendants. With respect to Montgomery County, plaintiff predicates liability upon the practice and policy of Mont-

---

**9.** Section 406(b) states in pertinent part:

 (b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

gomery County that did not adequately serve the needs of the mentally retarded citizens of Montgomery County. *See* Amended Complaint ¶ 14. Under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a local government, such as a county, is liable under section 1983 when the challenged action "may fairly be said to represent official policy". *Id.* at 694. An action or policy can be "official" if "made by [the municipality] law makers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* Of course, it is not necessary to prove that the official policy itself is unconstitutional. *Monell* requires only that the official policy cause the constitutional violation. *See McKinley v. City of Elroy,* 705 F.2d 1110, 1117 (9th Cir.1983); *Black v. Stephens,* 662 F.2d 181, 189 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). The county may not rely upon either the absolute or good faith immunity of its officers as a defense to liability under section 1983. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); *Reed v. Village of Shorewood,* 704 F.2d 943, 953 (7th Cir. 1983). Given plaintiff's allegations and the factual issue of whether the challenged policy caused the constitutional tort, summary judgment as to Montgomery County is inappropriate.

 Each of the remaining defendants were supervisory-level officials at the state and local level: O'Bannon was Secretary of Public Welfare of the Commonwealth of Pennsylvania; Rice was the Commissioner of the Southeastern Regional Office of Mental Retardation of the Commonwealth of Pennsylvania; Starr was the Superintendent of the Mental Retardation Unit of Embreeville State Hospital; and Roether was Administrator of the Montgomery County Office for Mental Health and Mental Retardation. With respect to most of these defendants, there exists a material question of fact as to their personal responsibility for the conditions of Strelicki's confinement, or the treatment which he received, thereby making summary

judgment inappropriate. Plaintiff has alleged that O'Bannon and Roether promoted policies that resulted in denying him minimally adequate treatment. For the purposes of section 1983, liability may be founded upon proof that the defendants affirmatively promoted a policy which sanctioned the type of action which caused the violation of an individual's rights. *See Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir. 1977). Summary judgment may not be granted upon the present record. Whether these defendants exercised acceptable professional judgment in promoting the policies plaintiff complains of requires a balancing of a variety of factors. This can only be done on a fully developed record establishing the level of treatment Strelecki was given and the defendants' actions in securing this treatment. *See Wilder v. City of New York,* 568 F.Supp. 1132, 1137 (E.D.N.Y.1983).

Starr has submitted an affidavit stating in his capacity as superintendent of Embreeville, he played no role in the medical treatment given to Strelecki. He maintains his supervision of the hospital medical staff is limited to administrative concerns. While this is relevant to his liability, if any, for the violation of Strelecki's right to be free from chemical restraints, it is unresponsive to the allegation that Starr accepted Strelecki into Embreeville with knowledge this facility would not provide adequate treatment to him. *See* Amended Complaint § 22. Therefore, summary judgment as to this defendant may not be granted.

 However, plaintiff's theory of liability against Rice requires his dismissal from this action. There are no allegations that Rice participated in any way in denying Strelecki of his right to be free from harm or to be free from chemical restraint. Instead, liability is premised exclusively upon actions which allegedly denied Strelecki's right to minimally adequate treatment by refusing to take any steps to have him admitted to Hilltop Haven. *See* Document No. 35, Interrogatory Answer No.

38(b). As I have previously noted, *see supra* n. 7, the right to treatment recognized in *Youngberg* does not include the right to care in a particular facility. *See Phillips v. Thompson,* 715 F.2d at 367. Accordingly, summary judgment as to Rice will be granted.

IV. Conclusion

Accordingly, I will dismiss the complaint insofar as plaintiff asserts a claim under 29 U.S.C. § 794 and the fourth, sixth, and eighth amendments. In addition, I will dismiss all claims asserted against defendants Parkhouse, Bartle, Banning, and Rice.