Margaret C. WAGNER

v.

FAIR ACRES GERIATRIC CENTER.

Civ. A. No. 93–2708.

United States District Court,
E.D. Pennsylvania.

Feb. 15, 1994.

Stephen A. Feldman, Feldman & Feldman and Richard Haaz, Philadelphia, PA, for plaintiffs.

William F. Holsten, II, Holsten & White and Andrew J. Bellwoar, Media, PA, for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Section 794 of the Rehabilitation Act of 1973 states in pertinent part:

No otherwise qualified handicapped individual ... shall solely by reason of his handicap be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance.

29 U.S.C. § 794 (commonly referred to as § 504).

The historical facts in this case are essentially undisputed. The issue to be decided is whether Fair Acres Geriatric Center, a county operated intermediate care nursing facility violated the Act when it denied admission to plaintiff, who is afflicted with Alzheimer's disease. Contending that there was a violation, plaintiff offered the testimony of three psychiatrists, none of whom had ever set foot in Fair Acres and had little or no knowledge of its population, staff or resources, who opined that she could be managed at Fair Acres. The Admissions Committee of Fair Acres,[1] after observing the plaintiff, consulting members of her family and her attending nurses, reviewing the medical records of her confinement at the Wills Eye Hospital Geriatric Psychiatric Institute (Wills), and after consulting a psychiatrist of their own choice, concluded that it could not meet her needs.

At the close of the plaintiff's case and at the close of all the evidence, defendant moved for judgment as a matter of law. The court reserved decision on these motions and submitted the issue to a jury. The jury found in favor of the plaintiff. Following the verdict, defendant renewed its motion for judgment as a matter of law. In the alternative, defendant asked for a new trial.

### A. The Motion for Judgment As a Matter of Law

Defendant, Fair Acres, is a 900[2] bed skilled intermediate nursing facility operated by the Delaware County Board of Institutional Management, licensed by the Pennsylvania Department of Health and certified

---

1. The Admissions Committee includes the Medical Director, the Director of Administration, The Director of Nursing, the Director of Psycho–Services, the specific caseworker, a community representative and a representative of the County Office for Services to the Aging.

2. As of the date of trial, the resident population was 910.

under Titles 18 and 19 of the Social Security Act. It receives approximately 400 applications for admission each year. Roughly 60% of the patients at Fair Acres suffer from Alzheimer's disease or other forms of dementia. It has a ratio of staff to patient of one to eight. Its stated mission and goal is to provide care primarily for the geriatric community. It is not staffed or equipped to handle psychiatric residents. If an applicant for admission poses a threat of injury to himself or others, the application is rejected. An applicant with a psychiatric history is reviewed individually to determine (a) if the applicant's primary diagnosis/condition is medical and warrants nursing home placement and (b) if the applicant can be absorbed comfortably and appropriately into Fair Acres geriatric population. (See policy statement Aug. 4, 1987. Deft. Ex. 11)

The plaintiff, Margaret Wagner, is a 65 year old married woman with three grown children, two daughters and a son. In 1988, she was diagnosed as having Alzheimer's disease. As time passed, she became very combative, breaking things and fighting with her husband to the extent that from time to time, he had to shut her in her room. Mr. Wagner was assisted in caring for his wife by his daughters and by visiting nurses, supplied through the County Office of Services to the Aging, who provided care for twenty-seven hours a week. Although the record is not specific as to time, it appears that Mrs. Wagner had been admitted to Haverford Community Hospital for Dilantin toxicity prior to her admission to the Dowden nursing facility in Newtown Square, Delaware County on August 23, 1992.[3] After ten days at Dowden, she was transferred to the Wills Geriatric Psychiatry Center operated by Thomas Jefferson University Hospital "in order to more effectively treat her agitation and psychotic symptoms" (Deft. Ex 1, page 14). The number of patients at Wills varies from 15 to 24 and its staff to patient ratio varies from three on four to two on one. During the first week at Wills, plaintiff became very assaultive with respect to the staff and other patients (Deft.

Ex 1 at pp. 19, 21–23, progress notes of 9/4/92 and 9/8/92).

Thereafter, an application for admission to Fair Acres was made and as of September 16, 1992, the Admissions Committee at Fair Acres determined that plaintiff was not then suitable for admission, but placed her application on "hold" pending further information as to her condition. No further information was forthcoming as of October 5, 1992 and; accordingly, the admissions committee denied her application. The staff psychiatrist at Wills, Dr. Kim, agreed that plaintiff was not suitable for nursing home care at the time of the September 16, 1992 application. Later, in the middle of October, 1992, he concluded that she was suitable for such placement despite the fact that the progress notes do not show any significant change in her overall behavioral pattern. The timing of Dr. Kim's change of opinion coincided with the exhaustion of Mrs. Wagner's hospitalization benefits[4]. The plaintiff was again evaluated by the Fair Acres Admissions Committee on October 28, 1992. In the meantime, plaintiff had been turned down at several other nursing homes because of the behavioral problems. (N.T. 9/21/93 pp. 35, 37 Deft. Ex. 2, p. 10 Wills' social worker's note).

The Admissions Committee, basically on the recommendation of its psychiatric consultant, Dr. Diwan, determined that the admission of plaintiff was not yet appropriate.

Entries in the Wills' records show that on October 9, 1992, the treating psychiatrist stated that the patient required 24 hour supervision and on October 14, 1992, it was noted that the patient required constant one-on-one care. A third note dated October 16, 1992 states that plaintiff "became combative in the hallway, grabbing another patient's shirt and attempting to hit and kick staff" and an attempt to place plaintiff in a gerichair resulted in a staff member receiving a scratch which drew blood. Another scratching incident took place on October 20, 1992

---

3. According to plaintiff's daughter, Fair Acres had agreed to admit plaintiff from Haverford, but the family decided it would be less expensive at Dowden. (N.T. 9/21/93, p. 67)

4. Note by treating psychiatrist: "Hospital coverage ends on 10/2. If bed not available, then we will need to discharge ... home." (See Entry 9/28/92, Ex. D 2, N.T. 9/21/93 p. 32).

when plaintiff was placed in a geri-chair for her own safety and to protect the staff. Additional incidents reflected in the Wills progress notes that pre-date Fair Acres' October 28, 1992 evaluation include:

10/10/92—Nursing Staff note: patient labile-laughing to assaultive behavior to crying; one-half of shift in geri-chair, *other half with staff* walking the halls. 10/11/92—Nursing Notes 6:00 P.M.: patient very agitated for past three hours, hollering vulgarities; 10/12/92—3:30 P.M., patient screaming loudly vulgarities, attempts to calm unsuccessful. Placed in geri-chair for safety. Ambulated with staff in attendance. 5:30 P.M., patient "escalated" became agitative and assaultive. 6:00 P.M., extremely agitated. Punched staff member when attempted to give her a drink. 10/17/92—Attacked staff member by hitting, scratching, and spitting; 2.5 milligrams inapsine given. Ambulated within eye's view for safety. 10/19/92— outbursts are angry, negative, labile. 10/21/92—Patient screaming very loudly at times. Placed in a quite room. Patient became agitative and assaultive.

See Deft. Ex. 2, p.p. 8, 11; Deft. Ex. 3, p.p. 13, 20–23.

The Wills records also reflect that during her stay plaintiff received antidepressants and neuroleptics including increasing dosages by injection of the anesthetic inapsine, a drug that none of the other psychiatrists ever heard of for use on a geriatric patient.

There was also a record of frequent use at Wills of a "quiet room" where a disruptive patient is confined so as not to distract or upset other patients. Fair Acres does not have a quiet room. All of its rooms have two or more residents in them.

Plaintiff was evaluated for a fourth time on January 6, 1993. The Wills record shows that her condition had not stabilized. She continued to exhibit the same agitated, assaultive and combative behavior.[5] The Admissions Committee's psychiatric consultant noted that plaintiff was still agitated, confused and irritable as late as December 29, 1992, but recommended a further evaluation in six to eight weeks.

On February 17, 1993, there was a fifth evaluation. Although plaintiff's behavioral problems improved slightly, the Wills records show that she continued to have episodes of combativeness, agitation and assaultiveness,[6] the same pattern of behavior that caused her transfer from Dowden to Wills in the first place. The records also reflect that she continued to receive 2.5 milligrams of inapsine on an "as needed" basis throughout February 1993. Accordingly, Mrs. Wagner was denied admission to Fair Acres at that time.

There was no further updating of plaintiff's condition and there was no further request for admission to Fair Acres until Mrs. Wagner's counsel, in a telephone call, demanded that she be admitted, (N.T. 9/21/93, p. 75). When informed that Fair Acres could not

---

5.  See Progress Notes Exhibits 4 and 5.

11/18/92—Patient had to be placed into quiet room. p. 52; 11/19/92—Patient struck out at staff several times. Patient curses and yells out repeatedly. p. 49–50; 11/20/92—Patient labile, cried and yelled, assaultive behavior. p. 48; 11/24/92—Patient agitated, lunging at staff's throats, becomes agitative and assaultive. Patient agitated and combative and attempted to strike another patient. Patient yelled most of the evening. p. 44; 11/28/92—Patient made several attempts to hit staff. p. 37; 12/4/92—Patient kicked and punched staff, pinching and kicking staff. p. 32; 12/13/92—Patient slapped staff member on the face and tried to kick others. p. 21; 12/21/92—Patient exhibits periods of combative and assaultive behavior. p. 12; 1/2/93— Patient extremely assaultive, punched, pinched,

and attempted to kick staff, kicking, kneeing staff's limbs, scratching. Deft. Exhibit 5 at p. 13.

6.  Wills' progress notes, Deft. Ex. D–5, pages 19, 21, 22, 23, 25, 26, 33, 36 and 38:

1/27/93—Patient requiring almost constant one on one interaction. p. 19; 1/29/93—Screaming and assaultive like behavior. Grabbing out at staff's face and clothing, smacking their heads when their head is down. p. 21; 1/30/93—Acted out physically and verbally at shower (but only needed 2 staff instead of 3). p. 22; 1/31/93— Periods of pinching staff and aggressive behavior. p. 23; 2/2/93—Continued to provide one on one care. p. 25; 2/2/93—Combative to staff. p. 26; 2/7/93—screaming, scratched staff, very combative. p. 33; 2/9/93—Screaming, grabbing at staff, combative. p. 36; 2/10/93—Needs more

meet her needs,[7] he threatened to file a lawsuit. Counsel made no effort to provide updated information concerning plaintiff's condition. (N.T. 9/21/93, p. 77).

On April 12, 1993, almost two months after her last evaluation by Fair Acres, the plaintiff was admitted to a special care unit for Alzheimer's patients at an Easton, Pennsylvania nursing facility, located approximately 85 miles from her home. One of the first reports emanating from the Easton facility showed that plaintiff, daily or more frequently, was physically abusive, "others were bit, shoved, scratched ..." and engaged in other "socially inappropriate or disruptive behavior." (N.T. 9/21/93, p. 57, Ex. D 12, p. 4).

Defendant does not dispute that Alzheimer's disease rendered Mrs. Wagner a handicapped person within the meaning of the statute and that a person with Alzheimer's cannot be denied admission on that basis alone. Indeed, as noted above, approximately 60 percent of defendant's population suffer from Alzheimer's or some other form of dementia. Nor is there any dispute that the Fair Acres' staff has the expertise to handle the medical aspects of such patients and that they are even prepared to handle infrequent or occasional outbursts of severe agitation, aggressiveness or assaultive conduct.[8]

But what distinguishes Mrs. Wagner is her behavioral pattern documented in the Wills records demonstrating a continuous course of aggressive, combative and socially inappropriate conduct which frequently required special monitoring and attention as well as increasingly larger doses of drugs including an anesthetic to calm her down.

The parties agree that, on occasion, nursing home residents have to be transferred to a psychiatric hospital in order to try to stabilize them and reduce the frequency of the periods of agitation, which is the precise reason Mrs. Wagner was at Wills. Indeed, the record shows that Fair Acres would transfer 25 to 30 patients per year for that reason.

It is also undisputed that such changes in environment are traumatic and have a deleterious effect on an Alzheimer's patient because it adds to the patient's confusion and exacerbates her condition. (See Gottlieb, N.T. 9/20/93, p. 42, Etemad, N.T. 9/21/93, p. 60). Accordingly, a person who exhibits such behavior within days prior to the Admissions Committee review, ought not to be admitted because the probability is that such person will have to be transferred or returned to a psychiatric facility within a short period of time, thus causing further aggravation of her condition. (See Etemad N.T. 9/21/93, p. 60).

Dr. Gottlieb testified that plaintiff would be suitable for Fair Acres because as he read the record of her stay at Wills, the periods of agitation were infrequent or occasional. (See plaintiff's brief p. 7). He conceded; nevertheless, that "to the extent she became uncontrollable, she would be a candidate for an acute short-term period of inpatient care at a psychiatric facility (2 to 4 weeks) for stabilization." *id.* With respect to the use of Inapsine, he testified that it is not commonly used with patients with behavioral difficulty, and in Mrs. Wagner's case, it was being used empirically to come up with some way of creating longer periods of calm because Wills had not been successful with other drugs. (N.T. 9/20/93, p. 73). The Wills records show that for five days in a row within ten days immediately preceding the February evaluation by Fair Acres, plaintiff had been injected with Inapsine and, consistent with Dr. Gottlieb's testimony, the Fair Acres Director of Admissions noted that continued use of Inapsine was a "tip-off" that the treating physician had not found the proper medicine for stabilizing her and was using Inapsine to "knock her out." (N.T. 9/21/93, pp. 114, 192).

Dr. Etemad did not examine Mrs. Wagner until two months after the last evaluation by

one on one attention. Screaming more. Will continue to monitor for safety. p. 38.

7. The regulations of the Pennsylvania Department of Health provide "A long term care facility shall admit only patients whose nursing care and physical needs can be provided by the staff and facility." § 201.24(c)

8. "... we do not mind an infrequent episodic agitation. Our concern is, if the agitation continues over a period of time ..." (N.T. 9/21/93, p. 160).

Fair Acres. Nor did he examine the Wills records. He relied on Dr. Kim's summary in arriving at his opinion that it was appropriate to transfer her to Fair Acres. At the same time, however, he conceded that it is not unreasonable for a nursing home to want assurances that a patient has been stabilized before receiving that patient from a psychiatric facility. (N.T. 9/21/93, p. 60).

The treating physician at Wills, Dr. Kim, testified that in about the third week in October, 1992 he felt that she could be accommodated in a nursing home because "she was fairly calm, she was no longer agitated constantly as she had been upon admission." (N.T. 9/21/93, p. 9). But his own records show that as of October 21, 1992, he felt that she "could be managed with eyesight supervision *when she is not agitated.*" (Ex. D. 3— Summary—emphasis added). Dr. Kim also conceded that shortly after October 23, 1992 "she was experiencing some episodes of increased agitation" (N.T. 9/21/93, p. 11). At this same time, Dr. Kim noted "that multiple nursing homes have rejected her based on her intermittent agitation," and commended the efforts of the Wills social worker to place this "difficult" patient. (N.T. 9/21/93, p. 34).

Dr. Kim's sanguine view of Mrs. Wagner's condition is not only in conflict with his own notes, but with the notes made by those who were continuously in direct contact with her during her stay at Wills, the attending nurses. For example, on December 9, 1992, the nurse's notes state: "was assaultive pinching staff and kicking staff." On December 15, 1992, Dr. Kim's treatment team noted that Mrs. Wagner has not been assaultive at all towards staff and patients. But the nurse's note for December 13, 1992 states "patient was assaultive to staff, slapping one in the face and trying to kick others." Further, as of December 21, 1992, Dr. Kim notes "No assaultive behavior in quite some time", but two days before that, all three nursing shifts report that she was very combative, screaming in the hallways and pushing, kicking and scratching staff. (N.T. 9/21/93, p. 111, 112) An inconsistency with relation to medication was also noted by the Admissions Director. On October 21, 1992, Dr. Kim recommended that "No PRN [as needed] medication be

given, as this would have an adverse effect on her cognitive functioning and would most likely result in increasing her confusion and furthering her agitation." (N.T. 9/21/93, pp. 113, 114). Nevertheless, as noted above, the records show that through February, 1993, she continued to receive Inapsine as needed. These contradictions understandably raised serious concerns in the minds of the Admissions Committee about the true status of Mrs. Wagner's condition. (N.T. 9/21/93, p. 110–114).

It was not the fact that Mrs. Wagner suffered from Alzheimer's disease that caused her rejection but the pattern of agitation, assaultive and combative behavior that continued almost unabated from the time she entered Wills to, at least, the February 17th evaluation by the Fair Acres Admission Committee.

While each of plaintiff's experts testified that her treatment had progressed to the point where she could be managed in a nursing home, without a reallocation of its resources, that is not enough to show discrimination. The issue is whether she is an otherwise qualified handicapped person who was denied admission solely by reason of the handicap. It is patently clear that she was not denied admission because she has Alzheimer's disease. She was denied admission because the records indisputably showed that she exhibited psychotic symptoms throughout her entire stay at Wills manifested by periods of uncontrolled agitation which, from time to time, escalated into episodes of violence. In the judgment of the Admission Committee, such behavior is inappropriate in an institution dedicated to caring for nine hundred elderly and physically impaired individuals.

As Dr. Etemad testified, it is a qualitative subjective judgment on the part of the people who are involved in the care of the patient (N.T. 9/21/93, pp. 61–62) and that nursing homes make their own decisions based on their own individual philosophy. (*Id.* p. 60).

■ In order to establish a violation of the Act, the plaintiff must prove:

1. that the plaintiff is a "handicapped individual",

2. that the plaintiff is otherwise qualified for participation in the program,

3. that the program receives "federal financial assistance", and

4. that she was "denied the benefits of" or "subject to discrimination" under the program solely by reason of her handicap.

*Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3rd Cir.1991), *Strathie v. Dept. of Transportation,* 716 F.2d 227, 230 (3rd Cir.1983).

■ It is clear from the opening paragraph of plaintiff's pre-trial memorandum that her § 504 cause of action is predicated upon the fact that she is a victim of Alzheimer's disease and that she was denied admission to Fair Acres "because of behavioral symptoms of agitation which were caused by and typical of her disability." Similarly, on page 4 of the pre-trial memorandum, it is stated "Mrs. Wagner's Alzheimer's Disease constituted a disability and a handicap." Indeed, all of the evidence offered by plaintiff was designed to show that Mrs. Wagner was the typical Alzheimer patient and, therefore, she should be admitted to Fair Acres.[9] But, as the Supreme Court pointed out in an employment context "An otherwise qualified person is one who can meet all of a program's requirements *in spite* of his handicap." (Emphasis added). *Southwestern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). *Cf. Doe v. New York University,* 666 F.2d 761 (2d Cir.1981). In the case at bar, plaintiff sought admission to Fair Acres *because* of her handicap and not *in spite* of her handicap, and thus she is not an "otherwise qualified" handicapped individual who has been denied a benefit solely by reason of her handicap. *Gieseking v. Schafer,* 672 F.Supp. 1249 (W.D.Mo.1987). *Flowers v. Webb,* 575 F.Supp. 1450, 1456 (E.D.N.Y.1983).

Further, as the Court noted in *Johnson By Johnson v. Thompson,* 971 F.2d 1487 (10th Cir.1992) at page 1493: "Section 504, by its very terms does not cover discrimination among similarly handicapped persons. The word *solely* provides the key: the discrimination must result from the handicap and from the handicap alone. If others with the same handicap do not suffer the discrimination, then the discrimination does not result 'solely by reason of [the] handicap.'" (citations omitted—emphasis in original).

Recognizing the force of this series of cases, plaintiff in a post argument submission, seems to have made a 180 degree turn with respect to her theory of § 504 liability. She now identifies her handicap as "the aggressive behavioral traits" caused by Alzheimer's disease. (Plaintiff's supplemental memorandum of law p. 8). Thus, contrary to the position of her experts and consistent with the view of the Fair Acres Admissions Committee, it was "the aggressive behavior" that set her apart from the other residents at Fair Acres.

In either event, however, "[w]here the handicapping condition is related to the condition to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was discriminatory". *United States v. University Hospital,* 729 F.2d 144, 157 (2d Cir.1984). In *Johnson v. Thompson,* 971 F.2d 1487 (10th Cir.1992), the Court held that infants were not "otherwise qualified" for treatment for spina bifida because the treatment sought would be wholly unnecessary in the absence of the handicapping condition. 971 F.2d at 1494.

So too, in the absence of the Alzheimer's Disease, Mrs. Wagner would not need the nursing home care she sought at Fair Acres. Clearly, she sought a benefit *because* of her Alzheimer's and not *in spite* of it.

■ Unlike the plaintiff in *Nathanson* who sought admission to medical school in spite of her back problem, not because of it, and the plaintiff in *Strathie* who sought a school bus driver's license in spite of his deafness, not

---

9. In his opening and in his summation, plaintiff's counsel referred to his client as a typical Alzheimer's patient. (See, e.g., N.T. 1/20/93, pp. 11, 17; N.T. 1/22/93 56, 61). See further, plaintiff's brief in opposition to defendant's motion for judgment as a matter of law, p. 8: "Mrs. Wag-

ner's Alzheimer's Disease constituted a disability and a handicap and that she should have been admitted to Fair Acres Geriatric Center as early as late September 1992", and also page 18 to the same effect.

because of it, Mrs. Wagner sought admission to an institution capable of caring for Alzheimer's sufferers because she also suffers from Alzheimer's. If Mrs. Wagner is entitled to admission to Fair Acres, it certainly is not by reason of Section 504. Section 504 prohibits discrimination only where the handicap is unrelated to the services sought. *United States v. University Hospital,* 729 F.2d 144, 156 (2d Cir.1984).

■ Moreover, having now conceded that it was Mrs. Wagner's "aggressive behavioral traits" that set her apart from the Fair Acres population, the issue then becomes whether § 504 requires an institution whose primary mission is the care of nine hundred elderly and physically impaired individuals to take on residents with psychiatric symptoms manifested by sustained episodes of agitation, combativeness and assaultiveness. The law does not require a hospital or other recipient of federal assistance to offer specialized treatment for particular handicaps. *Doe v. Colautti,* 592 F.2d 704, 708 (3rd Cir.1979). 45 C.F.R. § 84.12(a). Mrs. Wagner was not "otherwise qualified" for admission to Fair Acres because it was not the function of Fair Acres to provide psychiatric services for persons with disruptive psychotic disorders, particularly those persons whose condition has not been stabilized and whose symptoms remain uncontrolled. "[T]he policy decision not to commingle the elderly and physically handicapped with the mentally retarded in domiciliary facilities does not constitute 504 discrimination … a state agency must be permitted to 'strike a balance' between the particular interests of a handicapped person and a desire to defend the integrity of its programs." *Dempsey v. Ladd,* 840 F.2d 638, 641 (9th Cir.1987).

■ Thus, whether the handicap is defined as Alzheimer's or the effects of Alzheimer's, it is not a violation of § 504 to differentiate among applicants on the basis of the attributes of the handicap, *Anderson v. University of Wisconsin,* 841 F.2d 737, 740 (7th Cir. 1988), *Knutzen v. Eben Ezer Lutheran Housing Center,* 617 F.Supp. 977 (D.C.Colo. 1985), the severity of the handicap, *Johnson By Johnson v. Thompson,* 971 F.2d 1487, 1493 (10th Cir.1992), or the level of the handicap, *Willa v. Bradley,* 1992 WL 390875, 1992 U.S. Dist. Lexis 19030 (N.D.Ill.).

The fact that plaintiff's two experts [10] and her treating physician opined that Fair Acres could manage her case is not material.[11] Nor is it a case of Fair Acres making a reasonable accommodation. It has been plaintiff's position all along that reasonable accommodations were not necessary, only that minor adjustments in the daily routine of Fair Acres would be required when Mrs. Wagner became agitated. Plaintiff made no demand for accommodations which were not already available at Fair Acres.[12]

■ The decision not to admit Mrs. Wagner was a medical treatment decision made by Fair Acres medical and health care professionals and medical treatment decisions are generally immune from scrutiny under Section 504. *Bowen v. American Hospital Assoc.,* 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). In *U.S. v. University Hospital,* 729 F.2d 144 (2nd Cir.1984), it was held that treatment decisions involving a child with multiple handicaps do not come within the purview of § 504.

A psychiatric hospital is the proper place to treat patients with recurring episodes of psychotic behavior, at least until such time as the patient is stabilized. That is the reason Dowden Nursing Home transferred Mrs.

10. The Fair Acres Admissions Committee along with its psychiatric consultant did not have the benefit of these two opinions at the time the applications were being considered.

11. *Anderson v. University of Wisconsin,* 841 F.2d 737, 741 (7th Cir.1988). "There is a dispute about how Anderson would fair if placed back in the classroom, but this is not a 'material' issue. The Act does not designate a jury rather than the faculty of the Law School as the body to decide whether a would-be student is up to snuff". *Cf.*

*Kohl v. Woodhaven Learning Center,* 865 F.2d 930 (8th Cir.1989) (the opinions of experts who are unfamiliar with the institution, its programs and resources must yield to the judgment of the Administrators of the institution).

12. One court has held that the absence of a demand for reasonable accommodations was fatal to a plaintiff's § 504 claim. *Wood v. Spring Hill College,* 978 F.2d 1214, 1222 (11th Cir. 1992).

Wagner to Wills. "It would be unreasonable to infer that Congress intended to force institutions to accept or readmit persons who pose a significant risk of harm to themselves or others, even if the chances of harm were less than 50%." *Doe v. New York University,* 666 F.2d 761, 777 (2nd Cir.1981).

After a thorough investigation and review of the Wills records, Fair Acres made a reasoned medical decision that it could not properly treat Mrs. Wagner's symptoms as they then existed. "[C]onsiderable judicial deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny [a benefit] to handicapped persons." *Doe v. New York University,* 666 F.2d at 776. Whether Fair Acres' decision "was correct measured by 'objective' standards" is not the test. "What is relevant is that [Fair Acres] acted on its good faith belief about plaintiff's condition based on the Wills' records and Dr. Diwan's advice." *Pesterfield v. Tennessee Valley Authority,* 941 F.2d 437, 443 (6th Cir.1991). Even if Fair Acres erred in its analysis of the Wills' records, that error does not constitute a violation of § 504. *Anderson v. University of Wisconsin,* 841 F.2d at 741. Here, the plaintiff does not dispute that Fair Acres acted in good faith when it denied her admission. (N.T. 9/22/93 p. 77).

"The Rehabilitation Act forbids discrimination based on stereotypes about a handicap but it does not forbid decisions based on the actual attributes of the handicap". *Anderson v. University of Wisconsin,* 841 F.2d at 740.

I conclude that as a matter of law, plaintiff has failed to make out a case for relief under § 504 of the Act.

Accordingly, defendant's motion for judgment as a matter of law under Fed.R.Civ.P. 50 will be granted.

### B. Alternative Motion for a New Trial

Fed.R.Civ.P. 50(c) instructs the trial court to conditionally rule on a motion for a new trial in the event the judgment as a matter of law is reversed or vacated.

Defendant's alternative motion for a new trial is grounded on the following: 1) the failure of the court to give proper judicial deference to the judgment of the Fair Acres Administrators, that is, the failure of the court to make appropriate findings before submitting the case to the jury; 2) the failure of the court to give a proper jury instruction regarding the deference to which the Fair Acres Administrators are entitled; 3) the Court erred in admitting, over defendant's objection, the testimony of Dr. Etemad regarding plaintiff's condition after March 3, 1993; 4) the refusal of the Court to instruct the jury that when evaluating the alleged discrimination on the part of Fair Acres, they are not to consider any evidence that relates to plaintiff's condition after March 3, 1993; 5) the verdict is against the weight of the evidence.

■ Taking a cue from language in *Strathie v. Dept. of Trans.,* 716 F.2d at 231, defendant's first point suggests that the court should have made an explicit finding that there exists a factual basis in the record which reasonably demonstrates that accommodating the plaintiff would require either a modification of the essential nature of the program at Fair Acres or imposes an undue burden on Fair Acres.

Apparently Fair Acres views this finding as a prerequisite or prelude to a jury instruction concerning the deference to be paid to the judgment of the institution administrator. While I agree that the record in this case supports such a finding, I do not see the necessity for the court to make a finding in a matter tried to a jury.

■ This brings us to the second ground. The Court sustained plaintiff's objection to defendant's proposed point for charge # 6 which requested the Court to instruct the jury that some measure of deference be given to the judgment of the administrators of Fair Acres in rejecting plaintiff's application. I am now persuaded that this constituted prejudicial error.

In *Strathie,* the court stated "Program administrators surely are entitled to some measure of judicial deference [with regard to the reasonableness of a refusal to accommodate a handicapped individual] by reason of their experience with and knowledge of the pro-

gram in question." 716 F.2d at 231. This rule of deference is applicable whether it arises in an employment context, *Strathie v. Dept. of Trans., Pesterfield v. TVA,* an educational context, *Doe v. New York University, Anderson v. University of Wisconsin,* or a medical context, *Kohl v. Woodhaven.* Therefore, refusal to give the requested charge on this critical issue was an error requiring a new trial.

■ Grounds 3 and 4 relate to the admission of the testimony of Dr. Etemad. Dr. Etemad was called as an expert witness by the plaintiff and was permitted to testify over the defendant's objection on relevance grounds. Dr. Etemad had no contact with the plaintiff until two months after the last evaluation by Fair Acres. He did not examine the Wills records and he had no familiarity with the operation of Fair Acres. In the context of this case, his testimony was tenuous at best, but I am not convinced that its admission over defendant's objection amounted to prejudicial error.

■ The final basis asserted for a new trial is that the verdict was against the great weight of the evidence. I agree. As outlined in Part A above, the evidence, as demonstrated by the Wills' records, uncontrovertibly and overwhelmingly showed that at the time Fair Acres made the decision that Mrs. Wagner was not then appropriate for placement in its nursing home she was suffering from the same psychotic symptoms that caused her transfer from the Dowden Nursing Home to the Wills Psychiatric Hospital. Under the circumstances presented here, a final determination that Fair Acres violated § 504 of the Rehabilitation Act would result in a miscarriage of justice. Accordingly, if the judgment in favor of the defendant as a matter of law is vacated or reversed, I would grant a new trial. *See Roebuck v. Drexel University,* 852 F.2d 715, 735 (3rd Cir.1988).

### C. Plaintiff's Motion for a New Trial Limited to Damages

During the course of the trial plaintiff's counsel produced a paper which appeared to be a copy of a statement itemizing certain medical costs. The witness to whom it was presented (Dr. Kim) had never seen it before, had no knowledge of its source and could not otherwise identify or authenticate it. Plaintiff contends that this paper purports to show the cost of keeping Mrs. Wagner in Wills. But the paper itself stated that no funds were due from the patient and that the bill had been paid in full.

This effort was the extent of plaintiff's attempt to prove monetary damages. The court refused to permit the admission of this paper as proof of damages and, therefore, the issue of compensatory damages was not submitted to the jury. This ruling was unquestionably correct.

■ Even assuming that compensatory damages are available in nonintentional [13] discrimination cases under § 504, (*See Wood v. Spring Hill College,* 978 F.2d 1214 (11th Cir.1992), *Sabo v. O'Bannon,* 586 F.Supp. 1132, 1137 (E.D.Pa.1984) plaintiff's damage claim must fall because of total lack of proof. Failure to prove a claim is not grounds for a new trial.

In the event a new trial is granted on defendant's motion, I would not limit it to damages because the calculation of the damages will depend on the point in time at which defendant became liable—an issue which is hotly disputed and which was not resolved by the first jury.

[9] In its discretion, a trial court may limit a new trial to a portion of the issues litigated in the first trial. Fed.R.Civ.P. 59(a). *And see Vizzini v. Ford Motor Co.,* 569 F.2d 754, 759 (3d Cir.1977). The standard for determining whether a partial new trial is proper was long ago established: "Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Ref. Co.,* 283

---

13. At plaintiff's request, the court instructed the jury that plaintiff need not prove that the discrimination was intentional (N.T. 9/22/93, p. 85).

See also plaintiff's summation (N.T. 9/22/93, p. 37).

U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). We have interpreted the *Gasoline Products* standard to prevent determination of damages separate from liability when there is a complex or tangled fact situation. *Stanton v. Astra Pharmaceutical Products, Inc.*, 718 F.2d 553, 576 (3d Cir.1983); *Vizzini v. Ford Motor Co.*, 569 F.2d at 761.

*Simone v. Golden Nugget Hotel and Casino*, 844 F.2d 1031, 1040–1041 (3rd Cir.1988).

Plaintiff's motion for a new trial limited to damages will be denied.[14]

### ORDER

AND NOW, this 15th day of FEBRUARY, 1994, upon consideration of the post-trial motions filed by the parties for the reasons stated in the Memorandum of Decision filed herewith, it is

### ORDERED

1. Defendant's motion for judgment as a matter of law under Fed.R.Civ.P. 50 is GRANTED and judgment is hereby entered in favor of the defendant and against the plaintiff.

2. Defendant's alternative motion for a new trial is CONDITIONALLY GRANTED in the event the judgment as a matter of law in favor of the defendant is vacated or reversed.

3. Plaintiff's motion for a new trial limited to damages is DENIED.

---

**14.** Defendant also challenged the timeliness of plaintiff's motion. While the order for judgment was filed on September 22, 1993, it was entered on the docket on September 23, 1993 and, therefore, the motion was timely filed under the rule. *See* Fed.R.Civ.P. 59(b)