

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-15-1995

# Wagner v Fair Acres

Precedential or Non-Precedential:

Docket 94-1275

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Wagner v Fair Acres" (1995). *1995 Decisions.* Paper 76.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/76

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 94-1275

_____

MARGARET C. WAGNER, BY HER NEXT FRIEND
GEORGE M. WAGNER

vs.

FAIR ACRES GERIATRIC CENTER

Margaret Wagner, by her next
friend, George M. Wagner,

Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 93-cv-2708)

_____

ARGUED
September 14, 1994
Before:  SLOVITER, Chief Judge,
MANSMANN and ALARCON,* Circuit Judges.

(Filed March 15 , 1995)

_____

Stephen A. Feldman, Esquire (ARGUED)
Ellen R. Wase, Esquire
Richard P. Haaz, Esquire
Feldman & Feldman
1500 Walnut Street
Suite 904
Philadelphia, PA  19102

  COUNSEL FOR APPELLANT

William F. Holsten, II, Esquire (ARGUED)
Holsten & White
One Olive Street
Media, PA  19063

  COUNSEL FOR APPELLEE

*       Honorable Arthur L. Alarcon of the United States Court
of Appeals for the Ninth Circuit, sitting by designation.



Alison E. Hirschel, Esquire
Community Legal Services, Inc.
Law Center North Central
3638 North Broad Street
Philadelphia, PA  19140

Catherine C. Carr, Esquire
Community Legal Services, Inc.
Law Center South
1226 South Broad Street
Philadelphia, PA  19146

     COUNSEL FOR AMICUS CURIAE
     ALZHEIMER'S AND RELATED DISORDERS ASSOCIATION
       OF GREATER PHILADELPHIA
                            _____

                     OPINION OF THE COURT
                            _____


MANSMANN,  Circuit Judge.

        The general issue we address is whether Fair Acres

Geriatric Center, a county-operated intermediate care nursing

facility, violated Section 504 of the Rehabilitation Act of 1973,

29 U.S.C. Section 794, when it denied admission to Margaret C.

Wagner, a 65 year old woman afflicted with Alzheimer's disease.

Although Fair Acres admits Alzheimer's patients, it denied

admission to Mrs. Wagner because it determined that its facility

and staff could not accommodate the behavioral manifestations of

her disease.

        The jury was asked to decide whether, despite her

handicap of Alzheimer's disease, Mrs. Wagner was "otherwise

qualified" for admission to Fair Acres within the meaning of

section 504, including any reasonable accommodation Fair Acres was required to make.  Following the jury verdict in favor of Mrs. Wagner, the district court granted Fair Acres' motion for judgment as a matter of law, and conditionally granted its motion for a new trial.

We find that there was legally sufficient evidence to support the jury's verdict.  Thus, we will vacate the district court's grant of judgment as a matter of law for Fair Acres.  We are uncertain, however, that given the correct legal standards, the district court would have exercised its discretion in finding that the verdict was against the great weight of the evidence.  Thus we will also vacate the district court's conditional grant of Fair Acres' motion for a new trial and remand for reconsideration of this motion.

I.

In 1988, at age 58, Margaret Wagner was diagnosed as suffering from Alzheimer's disease, a chronic degenerative neurological disorder that impairs intellectual functioning.  Alzheimer's is associated with and has a devastating effect on intellectual functions including memory, recognition, comprehension and basic functional ability.  As the disease progresses, basic skills are lost, such as the ability to feed, dress, groom or bathe oneself.  Mrs. Wagner suffers from a particularly difficult, but not unique, form of Alzheimer's disease which is characterized by screaming, agitation and aggressive behavior.

Initially, Mrs. Wagner was cared for by her husband, assisted by his two adult daughters and by visiting nurses supplied through the County Office of Services to the Aging, who provided care approximately 27 hours a week. In the summer of 1992, however, Mrs. Wagner suffered a marked deterioration in cognitive functioning and behavior associated with her dementia. As a result, her family could no longer satisfactorily care for her at home.

On August 23, 1992, Mrs. Wagner was admitted to Dowden Nursing Home, a private facility located in Newton Square in Delaware County, Pennsylvania.[1] On September 2, 1992, she was transferred from Dowden to the Wills Geriatric Psychiatry Program operated by Thomas Jefferson University Hospital, due to Mrs. Wagner's severe episodes of agitated behavior and confusion.

On September 16, 1992, Wills made an initial referral for Mrs. Wagner to be admitted to Fair Acres Geriatric Center. Fair Acres is a 900-bed skilled intermediate nursing facility operated by the Delaware County Board of Institutional Management, licensed by the Pennsylvania Department of Health and certified under Titles 18 and 19 of the Social Security Act. Fair Acres receives county, state and federal funding, including Medicare and Medicaid funding. At least 98% of its patients are admitted under medical assistance.

---

[1]. Terressa Fleming, Mrs. Wagner's daughter, testified that financial reasons motivated the family to admit Mrs. Wagner to Dowden and that although her mother had been accepted at Fair Acres initially, the family was trying to obtain Medicaid approval prior to admitting her there.

Fair Acres' stated mission and goal is to provide care primarily for the geriatric community. Approximately 60% of its patients suffer from Alzheimer's disease or some other form of dementia. Although it has a staff-to-patient ratio of one to eight, it is not staffed or equipped to handle psychiatric residents. Accordingly, if an applicant for admission poses a threat of injury to himself or others, the application is rejected. An applicant's psychiatric history is reviewed to determine (1) if the applicant's primary diagnosis is medical, warranting nursing home placement and (2) if the applicant can be absorbed comfortably and appropriately into Fair Acres' geriatric population. See Fair Acres' admission's guidelines containing its "Psychiatric Policy." (A. 676).

On September 16, 1992, upon receiving Mrs. Wagner's application for admission, Fair Acres' Admissions Committee[2] made an initial determination that Mrs. Wagner was not then suitable for admission, but placed her application on "hold" pending further information regarding her condition. The Committee met again on October 8, 1992 and designated Mrs. Wagner's application as "medically disapproved," acting on the recommendation of its psychiatric consultant, Dr. Satyendra Diwan, that Mrs. Wagner was not appropriate for admission due to the behavioral problems she was exhibiting at Wills.

---

[2]. The Admissions Committee at Fair Acres is comprised of the Medical Director, the Director of Administration, the Director of Nursing, the Director of Psycho-Services, the specific caseworker, a community representative and a representative of the County Office for Services to the Aging.

Between Mrs. Wagner's second and third evaluations, Linda Hadfield, Fair Acres' admissions RN, visited Wills to speak with Mrs. Wagner's nurses and staff and to observe Mrs. Wagner firsthand.  Mrs. Wagner was put on "hold" again after the third admissions committee meeting on October 29, 1992.  Dr. Diwan's notes in the "comments" area of Mrs. Wagner's October 29th evaluation form indicated that Mrs. Wagner "needs more time" and was "not appropriate for Fair Acres."  (A. 226-227).

On December 30, 1992, due to contradictions in the documentation from Wills that had been submitted to Fair Acres, Ms. Hadfield made a second visit to Wills and on January 6, 1993, Dr. Diwan evaluated Mrs. Wagner for a fourth time.  After reviewing Wills' progress reports, Dr. Diwan noted that Mrs. Wagner was still agitated, confused and irritable as late as December 29, 1992, but recommended a further evaluation in six to eight weeks.  Finally, on February 17, 1993, a fifth evaluation took place.  Although Wills' hospital records indicated that Mrs. Wagner's behavioral problems had improved slightly, the records showed that she continued to experience episodes of combativeness, agitation and assaultiveness on a daily basis. Under "comments," Dr. Diwan noted that Mrs. Wagner was a "borderline case and will not fit into our milieu."  (A. 232). Accordingly, Mrs. Wagner was again denied admission to Fair Acres.

On April 12, 1993, approximately two months after her last evaluation by Fair Acres, Mrs. Wagner was admitted to Easton Nursing Center.  Easton Nursing Center is located approximately

85 miles from the home of Mrs. Wagner's husband and children. Because this represents a commute by car of one and one-half hours each way, the number of visits between Mrs. Wagner and her husband and children was severely curtailed. While Mrs. Wagner was at Wills, she was visited by her husband on a daily basis unless he was ill. Due to the fact that her husband has vision only in one eye, he was unable to make the trip to Easton independently. Consequently, while Mrs. Wagner was at Easton, her family was only able to visit her twice a week.

On May 21, 1993, Margaret Wagner, by her next friend George Wagner, filed a two count complaint in United States District Court for the Eastern District of Pennsylvania. Count One alleged that Fair Acres had discriminated against Mrs. Wagner on the basis of her handicap, the behavioral aspects of her dementia, in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, by refusing to admit her to its nursing facility. Mrs. Wagner sought a declaration that the acts of Fair Acres had violated her rights under section 504 of the Rehabilitation Act and sought injunctive relief enjoining Fair Acres from unlawfully excluding her from its facility and directing Fair Acres to admit Mrs. Wagner to its first available bed. She also sought damages and an award of attorney's fees and costs. In Count Two, Mrs. Wagner sought relief pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, 12131.[3]

---

[3]. This claim is not before us on appeal. At trial, counsel agreed with the court that the standards and proofs under

At trial, Mrs. Wagner introduced the testimony of three expert witnesses to support her claim that she was qualified for admission to Fair Acres in spite of the behavioral manifestations of her Alzheimer's disease. Dr. Gary L. Gottlieb, a geriatric psychiatrist and the director of the geriatric psychiatry program at the University of Pennsylvania School of Medicine, testified, based on his review of Mrs. Wagner's medical records, that as early as September, 1992, Mrs. Wagner was appropriate for the type of care provided by a nursing facility such as Fair Acres. Dr. Edward Kim, Mrs. Wagner's treating physician at Wills, testified that Mrs. Wagner could have been accommodated by a nursing home around the third week of October. Finally, Mrs. Wagner introduced the testimony of Dr. Bijan Etemad, a psychiatrist at Easton Nursing Center (where Mrs. Wagner resided at the time of trial), that in his judgment, Mrs. Wagner was appropriate for nursing home care.

Fair Acres argued that Mrs. Wagner's "sustained combative and assaultive behavior distinguished her from Fair Acres' patients and prevented her from being qualified for admission" (Appellee's brief at 15), because its guidelines prohibited it from admitting psychiatric patients. Challenging

(..continued)
the Rehabilitation Act and under the ADA were similar and that the case would be submitted to the jury under the Rehabilitation Act only. Because the court did not submit the ADA claim to the jury and based its opinion granting judgment as a matter of law for Fair Acres solely on the Rehabilitation Act, we have no record before us from which we can review Mrs. Wagner's ADA claim. Accordingly, we do not address the standards or proofs for establishing a claim under the ADA.

Mrs. Wagner's expert witnesses' lack of consideration for her need for one-on-one supervision, Fair Acres contended that it is not equipped, due to its staff to patient ratio, to provide one-on-one supervision for prolonged periods of time. It further asserted that Dr. Kim's testimony was at odds with and often contradicted his own progress notes, which indicated that Mrs. Wagner was still exhibiting symptoms of agitation and combativeness at the time when he claimed she became suitable for transfer to a nursing facility.

On September 22, 1993, at the close of all the evidence, Fair Acres moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. The court reserved its judgment on this motion and submitted the case to the jury on one issue -- whether Margaret Wagner was "otherwise qualified" for admission into Fair Acres within the meaning of section 504. After deliberating, the jury returned a verdict in favor of Mrs. Wagner.

On October 5, 1993, Fair Acres renewed its motion for judgment as a matter of law, or in the alternative for a new trial pursuant to Fed. R. Civ. P. 50(b), asserting that Mrs. Wagner was not "otherwise qualified" within the meaning of section 504 because she did not meet all of Fair Acres requirements for admission.[4] Fair Acres also contended, for the

_____

[4]. In support of its motion for a new trial, Fair Acres asserted that: (1) the court erred in failing to give proper judicial deference to the judgment of Fair Acres administrators; (2) the court erred in failing to give a proper jury instruction regarding the deference to which Fair Acres administrators were entitled; (3) the court erred in admitting the testimony of Dr.

first time, that Mrs. Wagner had not been discriminated against "solely by reason of handicap."[5]  On October 7, 1993, Mrs. Wagner filed a motion for a new trial limited to damages only.

On February 15, 1994, the district court entered its order granting Fair Acres' motion for judgment as a matter of law and conditionally granting its motion for a new trial.  The district court found that Mrs. Wagner was not an "otherwise qualified" handicapped individual who had been denied a benefit solely by reason of her handicap, because according to the court, she "sought admission to Fair Acres because of her handicap and not in spite of it."  Wagner v. Fair Acres Geriatric Center, 859 F. Supp. 776, 782 (E.D. Pa. 1994).  According to the court, the decision not to admit Mrs. Wagner was a medical treatment decision made by Fair Acres' medical and health care

(..continued)
Etemad regarding Mrs. Wagner's condition after March 3, 1993; (4) the court erred in refusing to instruct the jury that when evaluating the alleged discrimination on the part of Fair Acres, the jury was not to consider any evidence that related to Mrs. Wagner's condition after March 3, 1993; and (5) the verdict is against the weight of the evidence.

[5].      This issue was not submitted to the jury.  During its charge to the jury, after instructing the jury that in order to establish a violation of the Rehabilitation Act, a plaintiff must meet four requirements, the district court stated:

> In this case, I think only one of those
> requirements is at issue here, and that is
> the issue of whether or not she was otherwise
> qualified for participation in this program
> so that's the only issue I think you need to
> address in this case.

(A. 384).  Counsel agreed that this was the only aspect of Mrs. Wagner's prima facie case at issue.  (A. 319).

professionals, and medical treatment decisions are generally immune from scrutiny under section 504. Observing that Fair Acres admits patients suffering from Alzheimer's disease, the court also held that section 504, by its very terms, does not cover discrimination among similarly handicapped persons. Finally, the court concluded that Mrs. Wagner was not "otherwise qualified" for admission to Fair Acres based on the evidence introduced at trial, because "it was not the function of Fair Acres to provide psychiatric services for persons with disruptive psychotic disorders." Wagner v. Fair Acres, 859 F. Supp. at 783. Accordingly, the court concluded that Mrs. Wagner failed to establish a case for relief under section 504.

The district court, in ruling on Fair Acres' motion for a new trial, agreed with Fair Acres that its failure to instruct the jury that some measure of deference should be given to the judgment of the administrators of Fair Acres, constituted prejudicial error. The district court also found that the verdict was against the great weight of the evidence and that a final determination that Fair Acres violated section 504 of the Rehabilitation Act would result in a miscarriage of justice.[6] The district court denied Mrs. Wagner's motion for a new trial on the issue of damages.

---

[6]. With respect to Fair Acres' third and fourth grounds for a new trial, the district court held that the admission of Dr. Etemad's testimony, over Fair Acres' objection, did not amount to prejudicial error. See n.4 supra.

On February 18, 1994, Mrs. Wagner filed her notice of appeal from the district court's order entering judgment as a matter of law and conditionally granting Fair Acres' motion for a new trial. Mrs. Wagner did not appeal from the district court's denial of her motion for a new trial on damages.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.[7]

---

[7]. On or about November 7, 1993, Mrs. Wagner was approved for admission to Fair Acres. As counsel for Mrs. Wagner concedes, the fact that Mrs. Wagner currently resides at Fair Acres moots her claim for injunctive relief. Nonetheless, this does not moot her claim for declaratory relief and an award of attorney's fees and costs because we find that her claim for declaratory relief falls within the exception to the mootness doctrine characterized by the Supreme Court as "capable of repetition yet evading review."

"[T]he `capable of repetition, yet evading review' doctrine is limited to the situation where two elements combine: (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam) (citing Sosna v. Iowa, 419 U.S. 393 (1975)).

Applying these principles in Doe v. Colautti, 592 F.2d 704 (3d Cir. 1979), we held that Doe's Rehabilitation Act challenge to the Pennsylvania Medical Assistance Statute (which limited payments for care in private mental hospitals to 60 days in any benefit period) was not rendered moot by Doe's discharge from hospitalization. We found that the challenged action which ended with Doe's discharge from hospitalization was "in its duration too short to be fully litigated prior to its cessation or expiration" and Doe's psychiatric history created "a reasonable expectation that the complaining party [will] be subjected to the same action again." 592 F.2d at 707, (citing Super Tire Engineering Co. v. McCorkle, 416 U.S. 115 (1974)).

Here too, due to the nature of Alzheimer's disease and the fact that Alzheimer's patients suffer fluctuations in their

## II.

Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 4, prohibits a federally funded state program from

discriminating against a handicapped individual solely by reason

of his or her handicap.  Section 504 of the Rehabilitation Act

reads in pertinent part:

> No otherwise qualified handicapped individual
> in the United States, as defined in section
> 706(7) of this title shall, solely by reason
> of his handicap, be excluded from
> participation in, be denied the benefits of
> or be subjected to discrimination under any
> program or activity receiving Federal
> financial assistance . . . .

29 U.S.C. § 794.  A "handicapped individual" for purposes of the

Act is defined as "any person who (i) has a physical or mental

impairment which substantially limits one or more of such

person's major life activities, (ii) has a record of such

impairment, or (iii) is regarded as having such an impairment."

29 U.S.C. § 706(7)(B).  In order to establish a violation of the

Rehabilitation Act, a plaintiff must prove (1) that he is a

(..continued)
behavior, there is a reasonable expectation that Mrs. Wagner will
be subject to the same action again.  As the medical director of
Fair Acres testified, approximately 20-25 times a year Fair Acres
has to transfer a patient to an acute psychiatric care facility
for treatment.  Once stabilized, the patient is returned to Fair
Acres.  The concern in Mrs. Wagner's case is that if she is
discharged to an acute psychiatric care facility, such as Wills,
Fair Acres would be free once again to refuse to admit her.
Thus, we find that Mrs. Wagner's claim for a declaration that
Fair Acres' requirements, policies and practices are
discriminatory and a declaration that Fair Acres has a statutory
obligation to make reasonable accommodations so that Mrs. Wagner
can benefit from the services it provides is not moot.

"handicapped individual" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position sought "solely by reason of his handicap," and (4) that the program or activity in question receives federal financial assistance. Strathie v. Department of Transp., 716 F.2d 227 (3d Cir. 1983); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991). It is undisputed that Mrs. Wagner is a handicapped individual within the meaning of the Act and that Fair Acres is a recipient of federal assistance. Indeed, the only issue submitted to the jury was whether Mrs. Wagner was "otherwise qualified" for admission to Fair Acres.

In Southeastern Community College v. Davis, 442 U.S. 397 (1979), the Supreme Court held that an "otherwise qualified" handicapped individual is one who can meet all of a program's requirements in spite of his handicap. Id. at 406. Significantly, the Court indicated that an individual may be otherwise qualified in some instances even though he cannot meet all of a program's requirements. In Strathie, we observed that "this is the case when the refusal to modify an existing program would be unreasonable and thereby discriminatory." 716 F.2d at 230.

Further interpreting the Supreme Court's decision in Davis, we held in Strathie that two factors pertain to the reasonableness of a refusal to accommodate a handicapped individual. First, requiring accommodation is unreasonable if it would necessitate modification of the essential nature of the

program.  Second, requiring accommodation is unreasonable if it would place undue burdens, such as extensive costs, on the recipient of federal funds.  Davis, 442 U.S. at 412; Strathie, 716 F.2d at 230.  See also Easley by Easley v. Snider, 36 F.3d 297 (3d Cir.), reh'g denied, (Oct. 18, 1994).

In Easley, we held, "It follows, of course, that if there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or an undue burden, then the handicapped person is otherwise qualified."  Id.  Thus, in looking at whether an individual is otherwise qualified, we must analyze whether the person would be otherwise qualified if reasonable accommodations are made for his/her handicap.

A.

The district court reviewed these same cases and concluded that Mrs. Wagner was not an otherwise qualified handicapped individual because Mrs. Wagner "sought admission to Fair Acres because of her handicap and not in spite of her handicap, and thus she is not an `otherwise qualified' handicapped individual who has been denied a benefit solely by reason of handicap."  The district court concluded:

> . . . [I]n the absence of the Alzheimer's disease, Mrs. Wagner would not need the nursing home care she sought at Fair Acres. Clearly she sought a benefit because of her handicap and not in spite of it.
>
> Unlike the plaintiff in Nathanson [Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368 (3d Cir. 1991)] who sought admission to

> medical school in spite of her back problem, not because of it, and the plaintiff in Strathie who sought a school bus driver's license in spite of his deafness, not because of it, Mrs. Wagner sought admission to an institution capable of caring for Alzheimer's sufferers because she also suffers from Alzheimer's.

859 F. Supp. at 782-83.

We believe that in focusing on why Mrs. Wagner sought access to Fair Acres, the district court's analysis is misplaced. It is irrelevant why a plaintiff sought access to a program, service or institution; our concern, for purposes of section 504, is why a plaintiff is denied access to a program, service or institution. Obviously, everyone that applies for admission to a nursing home does so because of his or her disabilities. Indeed, no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care.[8] Further, if the district

---

[8]. Federal law defines a nursing home as an institution which:

    (1)  is primarily engaged in providing to residents

    (A)  Skilled nursing care and related services for residents who require medical or nursing care,

    (B)  Rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

    (C)  On a regular basis, health and related care and services to individuals who because of their mental or physical condition require care or services (above the level of room and board) which can be made available to them only

court's analysis is taken to its logical extreme, no program, service or institution designed specifically to meet the needs of the handicapped would ever have to comply with section 504 because every applicant would seek access to the program or facility because of a handicap, not in spite of it.  This result would contradict both the statutory and regulatory framework of section 504.

The legislative history of section 504 indicates that Congress clearly contemplated that section 504 would apply to nursing homes that receive federal funding.  The Senate Committee Report that introduced the Rehabilitation Act stated, "[T]he bill further proclaims a policy of nondiscrimination against otherwise qualified individuals with respect to participation in or access to any program which is in receipt of federal financial assistance."  S. Rep. No. 1135, 92 Cong., 2d Sess. 49.  See also 118 Cong. Rec. 32294.  The Report identified examples of the types of programs that section 504 was designed to cover: housing, transportation, education and health services.  Since the primary purpose of the Rehabilitation Act as enacted in 1973 was to extend and expand the 53-year old federal-state vocational rehabilitation program, Congress initially defined the phrase "handicapped individual" in terms of employment and

(..continued)
through institutional facilities .
. . .

42 U.S.C. § 1396r(a).  Thus, individuals without disabilities or illnesses would not be eligible for admission to a nursing home.

employability.[9]  However, because it was clearly the intent of Congress in adopting section 504, which Congress labeled "nondiscrimination in federal grants", the term "handicapped individual" was no longer to be narrowly limited to employment. As the Senate Report accompanying the 1974 amendments to the Rehabilitation Act elaborated:

Technical and Clarifying Changes

Definition of handicapped individual

Section 7(6) of the Rehabilitation Act of 1973 defines "handicapped individual." That definition has proven to be troublesome in its application to provisions of the Act such as sections 503 and 504 because of its orientation toward employment and its relation to vocational rehabilitation services.  It was clearly the intent of the Committee and of Congress in adopting section 503 (affirmative action) and section 504 (nondiscrimination) that the term "handicapped individual" in those sections was not to be narrowly limited to employment (in the case of section 504), nor to the individual's potential benefit from vocational rehabilitation services under Titles I and III (in the case of both sections 503 and 504) of the Act.

\* \* \*

---

[9]. Thus, the Act's original definition of the term "handicapped individual" included only those whose disability limited their employability, and those who could be expected to benefit from vocational rehabilitation. After reviewing the Department of Health, Education and Welfare's attempts to devise regulations implementing the Act, Congress concluded that the definition of "handicapped individual", while appropriate for the vocational rehabilitation provisions in Titles I and III of the Act, was too narrow to cover the range of discriminatory practices in housing, education and health care programs. School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 278 n.2, citing S. Rep. No. 93-1297 at 16, 37-38 and 50.

The Committee substitute adds a new definition of "handicapped individual" for the purposes of titles IV and V of the Act in order to embody this underlying intent.

Section 504 was enacted to prevent discrimination against all handicapped individuals, regardless of their need for, or ability to benefit from, vocational rehabilitation services, in relation to Federal assistance in employment, housing, transportation, education, health services, or any other Federally-aided programs. Examples of handicapped individuals who may suffer discrimination in the receipt of Federally-assisted services but who may have been unintentionally excluded from the protection of section 504 by the references to enhanced employability in section 7(6) are as follows: physically or mentally handicapped children who may be denied admission to Federally-supported school systems on the basis of their handicap; handicapped persons who may be denied admission to Federally-assisted nursing homes on the basis of their handicap; those persons whose handicap is so severe that employment is not feasible but who may be denied the benefits of a wide range of Federal programs; and those persons whose vocational rehabilitation is complete, but who may nevertheless be discriminated against in certain Federally-assisted activities.

S. Rep. No. 1297, 93d Cong., 2d Sess., reprinted in [1974] U.S. Code Cong. & Ad. News 6376, 6388–89. (Emphasis added.)

We interpret this legislative history as indicating that Congress contemplated that section 504 would apply to nursing home admissions decisions. Thus, we conclude that Mrs. Wagner was not prevented from seeking the protection of section 504 even though she was motivated to make application to Fair

Acres because of her disability.[10]  The district court erred, as a matter of law, in holding to the contrary.

B.

In addition to finding that Mrs. Wagner was not "otherwise qualified" on the ground that she sought admission to Fair Acres because of her handicap and not in spite of it, the district court also found that she was not otherwise qualified because Fair Acres' decision was a "medical treatment" decision. Citing Bowen v. American Hosp. Ass'n, 476 U.S. 610 (1986) and United States v. University Hosp., State University of New York at Stony Brook, 729 F.2d 144 (2d Cir. 1984), the district court concluded that "medical treatment decisions are generally immune from scrutiny under section 504." We disagree with the district court's characterization of this case.

In Bowen and University Hospital, the applicability of section 504 to the withholding of heroic medical treatment to profoundly handicapped infants was at issue. In University Hospital, the United States sought an order directing University

---

[10].  Indeed, the entire regulatory framework of section 504 contemplates the application of section 504 to Mrs. Wagner's case. Section 504's regulations prohibit discrimination against the handicapped in "health, welfare and social services programs that require or benefit from federal financial assistance," 40 C.F.R. § 84.51. Thus, to exclude health care facilities from the coverage of section 504 would be contrary to the Department of Health and Human Services' regulations interpreting section 504. These regulations, to which we must defer, specifically provide that recipients of federal funding providing "health, welfare and other social services" are subject to section 504. See CFR §§ 84.51 and 84.52.

Hospital to provide the Department of Health & Human Services with access to the medical records of a handicapped infant whose parents had refused to consent to corrective surgical procedures but, rather, had opted for conservative treatment of their infant's disabilities. The Court of Appeals for the Second Circuit held that the "otherwise qualified" criteria of Section 504 cannot be meaningfully applied to such medical treatment decisions. The court observed,

> . . . [w]here medical treatment is at issue, it is typically the handicap itself that gives rise to, or at least contributes to the need for services. . . . As a result, the phrase cannot be applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning. In common parlance, one would not ordinarily think of a newborn infant suffering from multiple birth defects as "otherwise qualified" to have corrective surgery performed. . . . If Congress intended section 504 to apply in this manner, it chose strange language indeed. . . . The legislative history, moreover, indicates that Congress never contemplated section 504 would apply to treatment decision of this nature.

729 F.2d at 156.

Similarly, the issue in Bowen was whether the Secretary of Health and Human Services had authority under the Rehabilitation Act to regulate medical treatment decisions concerning handicapped newborn infants. The Supreme Court, however, did not reach the issue of whether a medical treatment decision made on the basis of handicap is immune from scrutiny under section 504, because the Court held there was no evidence that the hospitals had denied treatment on the basis of handicap.

Rather, treatment was denied because of the absence of parental consent. Accordingly, the Supreme Court concluded, "A hospital's withholding of treatment from a handicapped infant when no parental consent has been given cannot violate Section 504, for without the parent's consent the infant is neither `otherwise qualified' for treatment nor has he been denied care solely by reason of his handicap." 476 U.S. at 610.

Unlike these medical treatment cases involving handicapped infants which necessitate complex assessments of the medical needs, benefits and risks of providing invasive medical care, the issue we confront here concerns the "essential nature" of the service that Fair Acres provides and involves an assessment of whether providing the skilled nursing care, which no one disputes Mrs. Wagner required, would alter the essential nature of Fair Acres' program or impose an undue burden in light of its program. See, e.g., Easley by Easley v. Snider, 36 F.3d at 305. A decision of this type, regarding whether an institution can provide certain services without a modification of the essential nature of its program or imposition of an undue burden, involves administrative decision-making and not medical judgment. For example, here Fair Acres must determine whether it is able to provide the requisite staff (i.e., nurses and nurses aids to care for, i.e., feed, bathe, and occupy Mrs. Wagner) as well as the appropriate physical accommodations without incurring extensive cost. These are decisions that administrators routinely make.

III.

Applying these legal principles, we now review the record to determine whether Mrs. Wagner presented legally sufficient evidence that she was "otherwise qualified" for admission to Fair Acres. Exercising plenary review over the district court's order granting Fair Acres' motion for judgment as a matter of law, we examine the record to determine whether the evidence presented was sufficient to permit the jury to find that Mrs. Wagner was "otherwise qualified." When reviewing the jury's finding that Mrs. Wagner was "otherwise qualified" for admission to Fair Acres, we give to her, as the verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in her favor and, in general, view the record in the light most favorable to her. See Williamson v. Consolidated Rail Corp., 926 F.2d at 1348 (3d Cir. 1991).

A.

In support of her assertion that there was a legally sufficient basis for the jury's determination that she was an "otherwise qualified individual," Mrs. Wagner points to the testimony of her three expert witness. Dr. Gottlieb reviewed Mrs. Wagner's medical records of her psychiatric hospitalization at Wills from September 2, 1992 until April 12, 1993. Based upon his review of these records, it was his opinion that Mrs. Wagner's behavior was consistent with a large proportion of people suffering from Alzheimer's disease. (A. 43). Dr.

Gottlieb testified that the largest proportion of people in nursing home settings have Alzheimer's disease and that Mrs. Wagner was appropriate or qualified for the services and type of intermediate care provided by Fair Acres Nursing home. Based on a reasonable degree of medical certainty, he believed it appropriate to transfer Mrs. Wagner back to a nursing home setting sometime between the end of September and the end of October of 1992. (A. 94).

Dr. Gottlieb also testified regarding the type of accommodations that Fair Acres would have to make in order to care for Mrs. Wagner. (A. 56). He testified that Mrs. Wagner's combative assaultive behavior occurred relatively infrequently, rarely more than once a day, and often it was predictable as to when this behavior would occur. (A. 79). Thus, he concluded that she would need one-to-one supervision infrequently. (A. 57).

Dr. Kim, Mrs. Wagner's treating psychiatrist at Wills testified that she did not require one-to-one supervision for extended periods of time and could be redirected easily. It was his opinion that about the third week of October, 1992, Mrs. Wagner could have been managed and accommodated by a nursing home.[11] (A. 124). Indeed, on October 23, 1992, Dr. Kim had

_____

[11]. Although Mrs. Wagner's records were evaluated for purposes of admission to Fair Acres on five different occasions, counsel for Mrs. Wagner conceded that, "There was no real factual dispute between the parties in regard to the first two evaluation dates. The testimony of both Dr. Gottlieb and Dr. Kim supports Fair Acres' decision on those two dates." Appellants' brief at p. 17.

written a letter to the administrator of Fair Acres stating that should Mrs. Wagner experience a deterioration in her mental status requiring rehospitalization, he would be willing to readmit her to Wills for further treatment and stabilization. (A. 126).

Dr. Etemad, the staff psychiatrist at Easton Nursing facility, testified that Easton Nursing Home is a regular nursing home that has patients at different levels of functioning. Although Dr. Etemad did not review the Wills records, he reviewed a final summary by a psychiatrist who was sent to Easton Nursing Home when Mrs. Wagner was transferred. (A. 173). Dr. Etemad evaluated Mrs. Wagner on April 14, two days after her admission to Easton and again around May 18, 1992. He testified that he saw her one time after that, and then there were no more requests by the staff for him to see her. During the five months preceding trial that Mrs. Wagner spent at Easton, Dr. Etemad informed the court that it was not necessary for her to be referred to an inpatient psychiatric hospital and that Easton was able to accommodate her and meet her needs. (A. 167). In his judgment, she is most appropriately classified as a nursing home patient.

Fair Acres' defense consisted of Mrs. Wagner's medical records and progress notes from her hospitalization at Wills, and the testimony of various members of Fair Acres' admissions committee who evaluated Mrs. Wagner's application for admission. R.N. Mimi Huver-Delaney, the Admissions Director at Fair Acres since 1982, testified that up to February 19, 1993, Fair Acres

would not have been staffed to handle the kind of treatment that Mrs. Wagner required. (A. 236). Admissions case worker Amy Thomas testified that Mrs. Wagner was not admitted to Fair Acres because they could not meet her needs.

Dr. Satyendra K. Diwan testified that, as a consultant to Fair Acres since 1981, he did not examine Mrs. Wagner personally but instead reviewed Mrs. Wagner's records with respect to her admission at Fair Acres. He is not board certified in either psychiatry or geriatric psychology. (A. 258). Dr. Diwan testified that he does not rely on any written criteria in order to evaluate whether someone is appropriate for admission. His own personal criterion is that the patient be symptom-free of agitation for a 3-4 week period. (A. 278-280).[12]

Dr. Diwan testified that Mrs. Wagner was inappropriate for care at Fair Acres the five times he reviewed her, mainly because of her dangerousness towards herself and others. (A. 259). He was not aware that, prior to her last review, she was not ambulating as her physical condition had weakened, nor was he aware of the fact that she was spending approximately 80% of her day confined in a geri-chair. (A. 275).

[12]. The reasonableness of this requirement for admission was called into question by Mrs. Wagner's experts. Dr. Kim testified that, by and large, a three week period without any symptoms of agitation is uncommon in many Alzheimer's patients and that it would be fairly common that a patient would exhibit some form of agitation on a daily basis. (A. 125). Dr. Etemad testified that it was not reasonable medical practice to look for symptom free behavior, i.e., no agitation for a 3-week period, as a precondition of admission to a nursing home. In his practice, he has never seen a patient who was totally asymptomatic before transfer to a nursing home. (A. 178).

Linda Hadfield, admissions coordinator at Fair Acres, testified that she visits almost every patient before admission to Fair Acres.  (A. 298).  She visited Mrs. Wagner on October 23, immediately prior to the third review.  (A. 300).  She discussed the techniques employed by Wills to calm Mrs. Wagner:  they would put her in a quiet room, massage her feet, play soft music for her -- techniques Fair Acres would not provide.  (A. 301).  On October 29th, the third meeting, Fair Acres put Mrs. Wagner on "for hold" status.  (A. 302).  Hadfield visited Wills again on December 30, between the third and fourth evaluation of Mrs. Wagner's application for admission.  She observed that Wills was still using the quiet room and inapsine to calm Mrs. Wagner.  (A. 304).  She testified that the nurse's notes did not always reflect what the psychiatric doctor wrote.  (A. 304).

B.

Based upon its review of this evidence, the district court held that there was no legally sufficient basis for the jury's determination that Margaret Wagner was an "otherwise qualified" individual for purposes of section 504,[13] because the

---

[13].    The third requirement for proving a case under section 504 is that the discrimination be "solely by reason of handicap." 29 U.S.C. § 794.  Although the parties agreed that this requirement was not an issue in this case, the district court appears to have conflated the issue of Mrs. Wagner's qualifications for admission with the issue of whether she was denied access to Fair Acres "solely by reason of handicap," a separate inquiry in the 504 analysis, not at issue in this case. The district court, citing Johnson by Johnson v. Thompson, 971 F.2d 1487 (10th Cir. 1992), observed:

court found that she did not meet Fair Acres' requirements for admission. The district court opined, "It was not the function of Fair Acres to provide psychiatric services for persons with disruptive psychotic disorders." Further, the court opined, "Nor is it a case of Fair Acres making a reasonable accommodation." 859 F. Supp. at 783. The district court's conclusions, in these regards, are erroneous. Because the district court arrived at these conclusions based upon the application of incorrect legal precepts, our review is plenary . Griffiths v. CIGNA Corp., 988 F.2d 457, 462 (3d Cir.), cert. denied, 114 S. Ct. 186 (1993).

IV.

The inquiry into whether an applicant is otherwise qualified necessarily involves a determination of whether the

(..continued)
> Section 504, by its very terms, does not cover discrimination among similarly handicapped persons. The word solely provides the key: the discrimination must result from the handicap alone. If others with the same handicap do not suffer the discrimination, then the discrimination does not result `solely by reason of [the] handicap.'

589 F. Supp. at 782 (citations omitted).

Here there was no dispute that Fair Acres accepted patients with Alzheimer's disease, but that Mrs. Wagner's aggressive behavior distinguished her and set her apart from the other residents of Fair Acres. Mrs. Wagner's complaint alleged that Fair Acres refused to accept her as a patient "solely by reason of her handicap (specifically, the resultant aggressive behavior when agitated)." Complaint ¶ 24, JA 13. Fair Acres never disputed that Mrs. Wagner was rejected due to the behavioral aspects of her disease.

applicant could have gained access to the program if the recipient of funds had made reasonable accommodations.  <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985).  In the unanimous decision in <u>Alexander</u>, the Supreme Court stated:

> <u>Davis</u> . . . struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs:  while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.
>
> The balance struck in <u>Davis</u> requires that an otherwise qualified individual must be provided with meaningful access to the benefit that the grantee offers.  The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

<u>Alexander</u>, 469 U.S. at 300 (citation and footnotes omitted).

As the Court of Appeals for the Fifth Circuit observed in <u>Brennan v. Stewart</u>, 834 F.2d 1248 (5th Cir. 1988), "After <u>Alexander</u>, it is clear that the phrase `otherwise qualified' has a paradoxical quality; on the one hand, it refers to a person who has the abilities or characteristics sought by the grantee; but on the other, it cannot refer only to those already capable of meeting <u>all</u> the requirements -- or else no reasonable requirement could ever violate section 504, no matter how easy it would be to accommodate handicapped individuals who cannot fulfill it."  834 F.2d 1248 (5th Cir. 1988).  We agree with the Court of Appeals

for the Fifth Circuit:  "The question after Alexander is the rather mushy one of whether some `reasonable accommodation' is available to satisfy the legitimate interests of both the grantee and the handicapped person."  834 F.2d at 1262.

In light of Alexander and our decision in Strathie, we are required to review the record to determine additionally if there was a factual basis in the record demonstrating that Fair Acres' refusal to accommodate Mrs. Wagner was unreasonable.  See Strathie, 716 F.2d at 230 (a section 504 claim could be defeated "if there is a factual basis in the record reasonably demonstrating that accommodating the individual would require either a modification of the essential nature of the program or impose an undue burden on the recipient of federal funds").  See also School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273 (1987) (determinations regarding whether plaintiffs are "otherwise qualified" will generally require an individualized inquiry and appropriate findings of fact).

Here there was ample evidence that Mrs. Wagner's aggressive behaviors associated with her Alzheimer's disease clearly rendered her, as amicus curiae characterizes her, "a challenging and demanding patient."  We find that this fact alone cannot justify her exclusion from a nursing home that receives federal funds.  Otherwise nursing homes would be free to "pick and choose" among patients, accepting and admitting only the

easiest patients to care for, leaving the more challenging and demanding patients with no place to turn for care.[14]

Indeed, the evidence introduced at trial confirmed that Mrs. Wagner was a difficult patient, one for whom the ravages of Alzheimer's disease were manifested in a myriad of extremely unpleasant ways -- by mood swings, periods of combativeness, and outbursts of shouting. However, as Mrs. Wagner's expert witness, Dr. Gottlieb, pointed out, "the fact that she had agitated behavior does not contradict that she could be managed in a nursing home." (A. 83-84).

Our review of the record reveals that Fair Acres presented little or no evidence about the type of accommodations it would have needed to make in order to provide care for Mrs.

_____

[14]. Dr. Gottlieb testified at trial that currently approximately four million Americans have been diagnosed with Alzheimer's disease and it is estimated that this disease affects 11 percent of all Americans who are over the age of 65. Moreover, the number of Americans afflicted with Alzheimer's disease is expected to increase with the size of the burgeoning elderly population. (A. 36). Consequently, many people who suffer from Alzheimer's will be forced to seek nursing home placement. Because Mrs. Wagner's plight is typical of a growing number of others, the issue of whether Fair Acres was required, in keeping with section 504, to make reasonable accommodations to care for Mrs. Wagner should have been, but was not, addressed.

The Alzheimer's Disease and Related Disorders Association of Greater Philadelphia points out in its amicus brief that "Contrary to the commonly held belief that nursing homes are `genteel rest homes for elderly people, the prevalence of psychiatric behavioral disorders in nursing homes has been estimated to range from 68 to 94 percent,'" citing Grossberg, Psychiatric Problems in the Nursing Home, 38 J. of the American Geriatrics Sec. 907 (1990). A recent study of a community nursing home suggests that 16 percent of the residents had at least one behavioral problem. Id.

Wagner. While Fair Acres made general allegations that it could not adequately care for Mrs. Wagner or meet her needs due to her aggressive behavior, it failed to offer any factual basis demonstrating that the admission of Mrs. Wagner to Fair Acres would have changed the essential nature of the facility as a nursing home or imposed an undue burden on the facility, economically or otherwise.

Larry Rendin, the medical director at Fair Acres for the past fifteen years, testified that of the 900 patients at his facility, some 64 to 70% are afflicted with Alzheimer's or dementia-related disease, that is, organic brain syndrome of one type or another.[15] Mr. Rendin agreed that some of the characteristics of the Alzheimer's patients at Fair Acres

_____

[15]. The fact that Fair Acres admits some patients suffering from certain forms of Alzheimer's has no impact on Mrs. Wagner's 504 claim. While section 504 does not apply to programs choosing among similarly handicapped people, an action under section 504 exists if a program is found to discriminate between distinct classes of handicapped persons. For instance, a program barring all severely retarded persons from a program available to mildly retarded persons may be discriminatory. See, e.g., Clark v. Cohen, 613 F. Supp. at 693 (holding that the claim of a denial of access to a program based on the relative aspects of a handicap [e.g., mildly retarded as opposed to severely retarded] qualifies under section 504); Jackson by Jackson v. Fort Stanton Hospital and Training School, 757 F. Supp. 1243 (D.N.M.), rev'd in part on other grounds, 964 F.2d 980 (10th Cir. 1992) (holding the failure of programs for the developmentally disabled to accommodate the severely handicapped in existing community programs while serving less severely handicapped persons is unreasonable and discriminatory because the severity of plaintiff's handicaps is itself a handicap which, under section 504, cannot be the sole reason for denying access to community programs); Plummer by Plummer v. Branstad, 731 F.2d 574, 578 (8th Cir. 1984) (the severity of the plaintiffs' handicaps is itself a handicap which under section 504 of the 1973 Rehabilitation Act cannot be the sole reason for denying them Title XX funding).

included screaming, yelling, confusion, agitation, combativeness and aggression on occasion and that "Fair Acres takes care of them and the staff is equipped to deal with that." (A. 95). He agreed that some patients require one-to-one care for certain periods of time, and many times Fair Acres has two or three staff members providing care to one patient. His facility is equipped to provide that level of care. (A. 97). Rendin also testified that between 20-25 times a year it is necessary to transfer a patient from Fair Acres to an in-patient psychiatric facility. (A. 98). Most are returned to Fair Acres after a few weeks and Fair Acres is then able to accommodate their needs. (A. 99). Thus the record reveals Fair Acres is clearly capable of providing and, in fact, has provided the kinds of services that Mrs. Wagner required, although she may have needed them on a more frequent basis.

Linda Hadfield, Fair Acres' admissions coordinator, discussed the techniques employed by Wills to calm Mrs. Wagner during her disturbances. These techniques included putting Mrs. Wagner in a "quiet room,"[16] massaging her feet, talking to her and playing soft music. Although Ms. Hadfield testified that Fair Acres did not provide these services, there was no evidence that these were calming techniques that Fair Acres could not provide, or that to do so would change the essential nature of Fair Acres as a nursing home into an acute psychiatric facility or impose an undue burden on Fair Acres.

---

[16]. A "quiet room" is an ordinary patient room that simply has one bed. (A. 154).

Ms. Hadfield opined that Mrs. Wagner was also not suitable for admission to Fair Acres because she had been receiving injections of Inapsine at Wills, a drug that Fair Acres had not previously administered.  Dr. Kim testified that he prescribed Inapsine for Mrs. Wagner while she was at Wills because Inapsine is a neuroleptic, or tranquilizing agent, which is very short acting and is available in vials and ampoules.  It is administered by intramuscular injection.  Notwithstanding the fact that Inapsine had not been administered at Fair Acres before, Dr. Gottlieb testified that Inapsine could be administered in a nursing home setting and that roughly 25 percent of the people in nursing homes receive supertrophic, sedating drugs on a daily basis.  Dr. Gottlieb's testimony was further supported by Larry Rendin when he testified that many of the patients at Fair Acres are administered Haldol.  (A. 107). Thus, based on this evidence, a jury could reasonably conclude that the accommodations Fair Acres would need to make to care for Mrs. Wagner were not unreasonable.

Fair Acres also contended that accommodating Mrs. Wagner would have created a health and safety risk to the staff and patients at Fair Acres.  (A. 389).  Dr. Diwan testified that "each time I concluded that she is not appropriate because mainly of her dangerousness towards others and herself."  (A. 260).  Our review reveals that Dr. Diwan's testimony was contradicted by the testimony of Mrs. Wagner's treating physician at Wills, Dr. Kim. Dr. Kim testified that he did not view Mrs. Wagner as creating a health or safety risk.  With respect to the references in her

chart that she was combative and assaultive, Dr. Kim testified that, "[W]e describe being combative or assaultive as any behavior that is resistive or aggressive. . . . But this is all [done by] someone who is essentially bedridden and can barely [sic] walk and is more or less slapping out like a child." (A. 129). Dr. Kim also testified on cross-examination that at the time of Mrs. Wagner's final evaluation in early February, she was spending 60-80% of her waking hours in a geri-chair, and that she needed 80% support by staff to remain upright. (A. 155). Thus, there was sufficient evidence presented from which a reasonable jury could conclude that Mrs. Wagner, at least by February, posed little threat to anyone's health or safety due to her extremely weakened physical condition.

Finally, by the later dates on which Mrs. Wagner was denied admission to Fair Acres, the jury could infer from the evidence that Mrs. Wagner would not have needed a quiet room or much of anything in the way of reasonable accommodation. For example, Dr. Kim testified that, "We noted that progressively she became more and more physically handicapped. She needed increasing assistance to walk, she needed to be spoon-fed, by the end of her stay, she became incontinent, needed to be in a diaper, and spent most of her days sitting in a chair staring off into space, occasionally making semi-coherent expressions, sometimes crying. But for the most part staring blankly off into space for a majority of that time." (A. 128).

Based on our review of the evidence, we find that a jury could have determined that at some point during the period

from September 1992 to February 1993, Mrs. Wagner was "otherwise qualified" for admission to Fair Acres in accordance with section 504 because Fair Acres could have cared for her if it made reasonable accommodations.  Thus, we must reverse the district court's order granting summary judgment as a matter of law.

V.

Concurrent with its motion for judgment as a matter of law, Fair Acres moved in the alternative for a new trial.  The district court conditionally granted Fair Acres' motion for a new trial on the grounds that:  (1) it was prejudicial error to fail to instruct the jury that administrators of Fair Acres were entitled to "some measure of deference," and (2) the verdict was against the great weight of the evidence.

The authority to grant a new trial resides in the exercise of sound discretion by the trial court, and will only be disturbed if the court abused that discretion.  Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980); American Bearing Co. v. Litton Industries, Inc., 729 F.2d 943, 948 (3d Cir.), cert. denied, 469 U.S. 854 (1984).  We are cognizant that a new trial may be granted even when judgment as a matter of law is inappropriate.  Roebuck v. Drexel University, 852 F.2d 715, 735 (3d Cir. 1988); American Bearing Co., 729 F.2d at 948 n.11.  See also Rousseau v. Teledyne Movible Offshore, Inc., 812 F.2d 971, 972 (5th Cir.) (affirming grant of new trial even though there was "legally sufficient evidence to support the verdict, thus foreclosing a j.n.o.v."), cert. denied, 484 U.S. 827 (1987).

With these principles in mind, we review the district court's

conditional grant of Fair Acres' alternative motion for a new

trial.

A.

At the close of all the evidence, Fair Acres submitted

the following instruction for inclusion in the court's points for

charge:

> Administrators from Fair Acres Geriatric
> Center are entitled to some measure of
> judicial deference in this matter, by reason
> of their experience with and knowledge of the
> administrative procedures in question.

Defendants' proposed points of charge No. 6.  Counsel for Mrs.

Wagner objected to this point for charge because counsel did not

believe the charge to be a correct statement of the law.  The

district court sustained Mrs. Wagner's objection and decided not

to include this point in its charge to the jury.  (A. 328).[17]  In

ruling on the motion for a new trial, the district court found

its refusal to give this charged constituted prejudicial error.

We disagree.

We addressed the issue of the deference to be given the

judgment of program administrators in cases arising under section

---

[17].      Mrs. Wagner points out that Fair Acres failed to
preserve this as an issue, because Fair Acres did not object to
the court's refusal to include the proposed instructions, either
at the discussion of the points for charge on the record or after
the charges to the jury.  (See N.T. 9/2/93 at p. 15, and J.A.
389.)  However, where an error in the instruction to the jury is
fundamental or may cause a miscarriage of justice, the court's
error in instructing the jury may be the basis for granting a new
trial, even if no proposed objection was raised.  Morley v.
Branca, 456 F.2d 1252 (3d Cir. 1992).

504 in our decision in Strathie v. Dept. of Transp., 716 F.2d 227

(3d Cir. 1983).  There we rejected the notion that broad judicial

deference was required, and instead we observed,

> Notably absent from the Supreme Court's opinion in Davis, however, is any discussion of the scope of judicial review with regard to the reasonableness of a refusal to accommodate a handicapped individual. Program administrators surely are entitled to some measure of judicial deference in this matter, by reason of their experience in question.  On the other hand, broad judicial deference resembling that associated with the "rational basis" test would substantially undermine Congress' intent in enacting section 504 that stereotypes or generalizations not deny handicapped individuals access to federally-funded programs.

716 F.2d at 231 (citations omitted)(emphasis added).  We then

held that "the following standard effectively reconciles these

competing considerations:  a handicapped individual who cannot

meet all of a program's requirements is not otherwise qualified

if there is a factual basis in the record reasonably

demonstrating that accommodating that individual would require

either a modification of the essential nature of the program, or

impose an undue burden on the recipient of federal funds."  716

F.2d at 231.  We observed that the Court of Appeals for the

Second Circuit has also applied this "factual basis" standard,

although it did not designate it as such.  See New York State

Ass'n for Retarded Children, Inc. v. Carey, 612 F.2d 644, 650 (2d

Cir. 1979) (section 504 prevented a city board of education from

excluding from its regular classrooms mentally retarded children

who were thought to be carriers of hepatitis, when the board was unable to demonstrate that the health hazard posed by the children was anything more than a remote possibility).[18]

In the present case, there was no factual basis demonstrating that accommodating Mrs. Wagner would require Fair Acres to modify the essential nature of its program, or impose an undue burden upon it. In the absence of such a factual basis, Fair Acres' request that the jury be instructed that Fair Acres administrators be accorded "some" deference cannot be justified. Accordingly, the district court's failure to give an instruction that Fair Acres administrators were entitled to some measure of deference by reason of their experience with and knowledge of the procedures in question, was not legal error. Clearly it would not then rise to the level of fundamental error.

Here the district court's instructions to the jury in this regard struck the appropriate balance between deference to program administrators and the anti-discrimination mandate of section 504. The district court informed the jury that while Fair Acres was required to make reasonable accommodations, it was not required to make fundamental or substantial modifications to its program.[19] Additionally, the district court instructed the

---

[18]. See also School Bd. of Nassau County v. Arline, 480 U.S. 273 (1987), where the Supreme Court held that courts should give deference to the medical judgments of independent public health officials on the issue of the contagiousness of infectious diseases but left open the question of whether courts should also defer to the reasonable medical judgments of private physicians upon which an employer has reasonably relied. Id. at 288, n.18.


[19]. The district court charged:

jury that it must consider the views and evaluation process of

Fair Acres.  The court instructed the jury that it "must take

(..continued)

> Now, the law also requires, however, that a nursing home facility such as Fair Acres make reasonable accommodations to the known physical and mental limitations of an otherwise-qualified handicapped person.  But they are not required to make fundamental or substantial modifications to their program.  In other words, they are not required to become something other than what they purport to be; that is, a skilled long-term nursing home with certain admission criteria which they believe they are entitled to use and determine who should be admitted and who should not be admitted.

> The accommodation that the law requires them to make must be reasonable; it can't be unreasonable.  This is just an analogy, it may not be applicable in this case, but they cannot make a nursing home -- turn it into a burn center or a psychiatric institution or something like that, because that would require substantial or fundamental modification of the program which they have in existence.

> But on the other hand, if their program would accommodate Mrs. Wagner with only inconsequential or nonsubstantial changes, then under the law they are required to do that.

> So that if you find that a fundamental or substantial modification is necessary in order to accommodate the plaintiff, the Rehabilitation Act does not apply.

> On the other hand, if they can accommodate her with reasonable changes in their program, then of course the Act does apply.

(A. 386-87).

into account the evaluation made by the institution itself in the absence of a showing that its standards and its application of those standards serves no purpose other than to deny access to handicapped persons." (A. 385).

### B.

Finally, the district court conditionally granted Fair Acres' motion for a new trial on the grounds that the verdict was against the great weight of the evidence. The district court found "the evidence, as demonstrated by the Wills records, incontrovertibly and overwhelmingly showed that at the time Fair Acres made the decision that Mrs. Wagner was not appropriate for placement in its nursing home she was suffering from the same psychotic symptoms that caused her transfer from the Dowden Nursing Home to Wills Psychiatric Hospital." Under these circumstances, "a final determination that Fair Acres violated section 504 of the Rehabilitation Act would result in a miscarriage of justice." 859 F. Supp. at 785.

The authority to grant a new trial, as previously stated, is confined to the trial court. Thus, our review is extremely deferential. We have held that "[s]uch deference is peculiarly appropriate in reviewing a ruling that a verdict is against the weight of the evidence because the district court was able to observe the witnesses and follow the trial in a way that we cannot replicate by reviewing a cold record." Roebuck, supra, 852 F.2d at 735.

We have reviewed the record for evidence that is legally sufficient to support the jury's verdict. We find that Mrs. Wagner presented sufficient evidence to preclude the district court's granting judgment against her as a matter of law. Given, however, the district court's application of incorrect legal standards regarding the applicability of section 504 to the facts in this case, we are uncertain as to whether the court would have granted a new trial under the appropriate legal standards. Consequently, we will vacate the court's order granting a new trial and remand to the district court for reconsideration of this motion.

## VI.

For the foregoing reasons we will vacate the district court's order granting judgment as a matter of law and vacate the district court's order conditionally granting a new trial. We will remand for further proceedings consistent with our decision. Costs are taxed against appellee.

---